UNITED STATES of America,
Plaintiff-Appellee,

v.

Nathan George DINITZ,
Defendant-Appellant.

No. 73–2109.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1976.

Rehearing and Rehearing En Banc
Denied Nov. 3, 1976.

Percy Foreman, Dick DeGuerin, Houston, Tex., for defendant-appellant.

Michael P. Carnes, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before COLEMAN, GOLDBERG and GEE, Circuit Judges.

S. Gunter Toney (Court-appointed), Tallahassee, Fla., Fletcher N. Baldwin, Jr. (Court-appointed), Gainesville, Fla., for defendant-appellant.

William H. Stafford, Jr., U. S. Atty., Robert L. Crongeyer, Jr., Nick P. Geeker, Asst. U. S. Attys., Pensacola, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and GEWIN, COLEMAN, GOLDBERG, AINS-

WORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE, TJOFLAT and HILL, Circuit Judges.*

TJOFLAT, Circuit Judge.

On April 17, 1973, Nathan Dinitz was convicted of violating 21 U.S.C. § 846 by conspiring to distribute a Schedule I controlled substance (LSD) and of violating 21 U.S.C. § 841(a)(1) by distributing LSD. A panel of this court reversed that conviction, holding that Dinitz had been placed in double jeopardy in violation of his Fifth Amendment rights. *United States v. Dinitz*, 492 F.2d 53 (5th Cir. 1974). By a closely divided vote (8–7), this court en banc affirmed the panel decision. *United States v. Dinitz*, 504 F.2d 854 (5th Cir. 1974) (en banc). On certiorari, the Supreme Court reversed and remanded the case for further proceedings. *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Thus, we must now consider the remaining issues raised by Dinitz (exclusive of the double jeopardy issue) on his original appeal.

I

On December 8, 1972, Nathan Dinitz was arrested for distributing LSD and for conspiring to distribute LSD. Dinitz was, at the time, a third-year law student at the University of Florida. About six weeks prior to the date of his arrest, it was alleged, Dinitz had sold 48 tablets of LSD to a federal undercover narcotics agent, Steve Cox.

About a week after Dinitz's arrest, he was allegedly the subject of an extortion attempt, in which an unidentified telephone caller advised Dinitz that he could have the charges dropped in exchange for $2,000. Dinitz reported the incident to the authorities, and two FBI agents investigated the matter. As part of the investigation, a fake "payoff" envelope, filled with paper, was left at the prearranged pickup site. Although one of the FBI agents saw a man pick up the envelope, the agents were unable to apprehend him.

On February 14, 1973, Dinitz came to trial. This trial was aborted in its inception. It ended in a mistrial shortly after the defendant's opening statement had begun, when the repeated misconduct of one of Dinitz's attorneys[1], Maurice Wagner, caused the district judge to order Wagner to leave the courtroom. Specifically, the judge was prompted to order Wagner's removal by Wagner's efforts, during his opening statement, to tell the jury about the attempt to extort money from Dinitz. When Wagner began to relate the facts of the extortion attempt to the jury, the judge excused the jury and asked Wagner if he had any evidence to show that Agent Cox, the chief government witness, could be connected to the incident. When Wagner indicated that he had no such evidence, the judge ordered him to leave the courtroom[2].

---

* Because of illness Judge Wisdom did not participate in the hearing or in the consideration of this case on remand. Judge Thornberry was a member of the En Banc court that heard oral arguments but due to illness did not participate in this decision.

1. When the trial began, Dinitz had three attorneys present: Mr. Jeffrey Meldon, who had represented Dinitz since the time of his arrest; Mr. Fletcher Baldwin, a University of Florida law professor who briefed and argued Dinitz's appeal; and Mr. Wagner, who was apparently hired only a few days before Dinitz's trial began.

2. The attempts to allude to the extortion incident were by no means the only instances of misconduct on Wagner's part. For a more detailed account of Wagner's conduct, see the statements of facts in the original panel opinion, 492 F.2d 53, and in the Supreme Court's opinion, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267. We shall discuss specific instances of misconduct as it becomes necessary to do so *infra*.

The issue raised on the original appeal of this case, and foreclosed here by the Supreme Court's decision, was whether the retrial of Dinitz violated his Fifth Amendment right not to be placed in double jeopardy. Specifically, Dinitz argued that the district judge overreached his authority in ordering Wagner to leave the courtroom during the first trial. Thus, the district court left him with virtually no choice but to move for a mistrial, and the validity of the court's declaration of a mistrial (Dinitz argued) ought to have been governed by the "manifest necessity" standard of *United*

Although not a member of the bar of the Northern District of Florida, Wagner had been allowed to appear in the case *pro hac vice*. After Wagner's dismissal, he did not formally move for reinstatement. Dinitz, on the other hand, made repeated motions, both oral and written, for Wagner's reinstatement. All of these were denied.

About two months after the aborted first trial, Dinitz's second trial began. Rather than securing alternate counsel, Dinitz chose to represent himself. During the government's presentation of its case in chief, Agent Cox testified about the general circumstances under which he had bought the LSD from Dinitz. On cross-examination, Dinitz attempted to impeach Cox by asking him whether he had given inconsistent testimony at an earlier trial. When the prosecutor objected, Dinitz advised the court that he had a transcript of Cox's earlier testimony, but admitted that it had been given in an unrelated case involving issues totally irrelevant to those presented in his trial. The objection was sustained and the line of cross-examination was precluded. Dinitz also informed the court of his desire to cross-examine Cox about the extortion attempt. When the court announced that a voir dire hearing in the jury's absence would have to precede the examination in order to consider his proposed line of inquiry, Dinitz abandoned the strategy. Later on, during the presentation of his case, he once again (in the absence of the jury) raised the extortion issue. The court repeated its earlier inquiry as to whether he had any evidence to connect Agent Cox with the episode. For the first time in the case, Dinitz stated that there

was "a tremendous similarity" between the voice on the telephone (which communicated the demand for money) and the voice of Agent Cox [3]. He did not commit himself to testify, however. Instead, he renewed his application for an *in camera* inspection of the FBI files concerning its investigation of the extortion report [4]. This blanket application for the court to peruse these files was denied. However, the two FBI agents who conducted the investigation were examined by the court and stated that there was no physical similarity between the man who picked up the envelope and Agent Cox. When Dinitz advised the court that he had nothing further to offer on the issue, the inquiry ended, and Dinitz was precluded from going into extortion attempt before the jury.

At the end of Dinitz's one-day trial, the jury returned a verdict of guilty on both counts of Dinitz's indictment, *i. e.*, the conspiracy count and the distribution count. Approximately one month later, he was sentenced to serve concurrent five-year sentences for these violations.

At this stage of the proceedings, Dinitz argues (1) that the dismissal of Wagner and the refusal to reinstate him violated Dinitz's Sixth Amendment right to counsel, (2) that it was error not to allow him to impeach Agent Cox through (a) the use of evidence of the extortion attempt and (b) the use of the transcript from a previous, unrelated trial, and (3) that it was error for the court to refuse to make an *in camera* inspection of the FBI files. Finding none of these contentions meritorious, we affirm the judgment of the district court.

States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), rather than the "prosecutorial or judicial bad faith" standard of *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). The Supreme Court rejected this argument, holding that the *Jorn* standard applied to Dinitz's case. The Court then found that "here the trial judge's banishment of Wagner from the proceedings was not done in bad faith in order to goad the respondent into requesting a mistrial or to prejudice his prospects for an acquittal." *United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (1976). Since, as the Court stated, the district

judge's action was not "motivated by bad faith or undertaken to harass or prejudice [Dinitz]," the mistrial did not bar a second trial of Dinitz's case. *Id.*

3. During the first trial, when the court asked attorney Wagner if he had any evidence that Agent Cox was involved in the extortion incident, no mention was made that Dinitz himself could implicate Cox. See text to note 2, *supra.*

4. Dinitz had filed a written pre-trial motion for the court to inspect these FBI files *in camera.*

## II

Dinitz first argues that his Sixth Amendment right to counsel was violated when the district court banned Wagner from the first trial and precluded him from appearing thereafter. It is of course conceded that under the Sixth Amendment [5] Dinitz was entitled to the representation of counsel in this case. Dinitz acknowledges that the Amendment does not afford a defendant the unqualified right to counsel of his choice, and that the right to counsel of one's choice is limited to some extent. His argument is that, in this case, the district court could not properly deny him the representation of the counsel of his choice, i. e., Maurice Wagner.

▮ We certainly agree that the Sixth Amendment right to counsel is an absolute, unqualified right to the representation of counsel. And we also agree that the Sixth Amendment requires the courts to respect a defendant's own particular *choice* of counsel. As Mr. Justice Sutherland wrote nearly fifty years ago in the seminal case of *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), "[i]f in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.* at 69, 53 S.Ct. at 64. There are, however, some limits to the constitutional right to be heard through the counsel of one's choice. *Powell* itself contemplates the existence of such limits when it states that "the right to counsel being conceded, a defendant should be afforded a *fair opportunity* to secure counsel of his own choice." *Id.* at 53, 53 S.Ct. at 58 (em-

phasis added). There is some point short of allowing a defendant complete freedom in choosing his own counsel at which the Sixth Amendment's prescription is satisfied. To hold otherwise would necessarily condemn, for example, even local bar admission requirements, and no one would seriously maintain that the Sixth Amendment requires that.

▮ To make an informed judgment in this case, we must place this qualified right to choose one's own counsel against the backdrop of judicial discretion. Traditionally, courts enjoy broad discretion to determine who shall practice before them and to monitor the conduct of those who do. Since attorneys are officers of the courts before which they appear, such courts are necessarily vested with the authority, within certain limits, to control attorneys' conduct. *See, e. g., Phipps v. Wilson,* 186 F.2d 748 (7th Cir. 1951); ABA Standards Relating to the Administration of Criminal Justice, The Function of the Trial Judge §§ 6.3, 6.5 (1972); *cf. Theard v. United States,* 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); 28 U.S.C. § 1654 (1970). And this is especially true during the course of a trial, when an attorney's misconduct may directly impede the orderly administration of justice [6]. In this connection, of course, the Sixth Amendment is indisputably relevant, for it helps define the limits of judicial discretion. But the Sixth Amendment's right to *choice* of counsel merely informs judicial discretion—it does not displace it. Our inquiry, then, must focus on the trial court's exercise of its discretion. In each case, we must inquire whether, given the defendant's qualified right to choose his own counsel, the trial court's refusal to hear the defendant through his chosen counsel constituted an abuse of discretion [7]. Thus,

---

5. The pertinent part of the Sixth Amendment of the United States Constitution reads: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

6. *See Maness v. Meyers,* 419 U.S. 449, 459, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975):

 [Orders given during the course of a trial] must be complied with promptly and com-

pletely, for the alternative would be to frustrate and disrupt the progress of the trial with issues collateral to the central questions in litigation. . . . [O]nce the court has ruled, counsel and others involved in the action must abide by the ruling and comply with the court's orders.

7. Indeed, this has always been our standard of review in cases of this sort. In the context of court-appointed counsel, for example, a panel

in the context of Dinitz's case, we must consider each instance at which the district judge exercised his discretion in disallowing Wagner to appear for Dinitz.

■ The first such instance occurred during Dinitz's first trial, when the district judge ordered Wagner to remove himself from the courtroom. A thorough review of the record convinces us that, under the circumstances, the court's order was not an abuse of its discretion.

Our conclusion is particularly compelling when we review the sequence of events which led to Wagner's removal. To begin with, Wagner was not a member of the bar of the Northern District of Florida. He made no written request to appear in Dinitz's case; in fact, his appearance was not brought to the district judge's attention until the first day of the trial, at which time the court allowed him to appear *pro hac vice*. Almost immediately after a jury was empaneled, defense counsel orally renewed a motion to suppress. Although the grounds for that motion were not clear, the court began to conduct a hearing on the motion. For the bulk of that hearing Wagner questioned the chief government witness, Agent Cox, about facts having no discernible connection to the potential suppression of evidence[8]. Eventually it became apparent that Wagner had no grounds for his motion to suppress, and the court denied the motion[9].

Wagner's final transgressions occurred during his opening statement to the jury. Despite several warnings, Wagner continually exceeded the permissible scope of an opening statement[10]. Finally he began to tell the jury about the alleged attempt to extort Dinitz after his arrest. At that point, the court sent the jury out and asked Wagner if he had any evidence to connect Agent Cox with the extortion attempt. When Wagner was unable to show that he

of this court has held that the question of whether to appoint new counsel for a defendant is within the sound discretion of the trial court, and has gone on to uphold the court's use of that discretion. *United States v. Young,* 482 F.2d 993 (5th Cir. 1973). And even when a defendant seeks to retain new counsel in replacement of his court-appointed counsel, a trial judge may, within his discretion, disallow it. *United States v. Sexton,* 473 F.2d 512 (5th Cir. 1973). Of course, the fundamental concern which dictates that there be some range of judicial discretion is the need for order as a means toward justice; as the panel stated in *United States v. Casey,* 480 F.2d 151 (5th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973), "[t]he freedom to choose one's counsel may not be used as a device to manipulate or subvert the orderly procedure of the courts or the fair administration of justice." *Id.* at 152. *See also United States v. Terry,* 449 F.2d 727 (5th Cir. 1971).

8. The court repeatedly warned Wagner to get to the point of his motion. The record shows that at least five separate warnings were delivered to Wagner during his examination of Agent Cox.

9. The motion was not accompanied by any affidavit by which the court could have narrowed the factual issues. The court finally asked Wagner to make a proffer of proof with respect to what he intended to show by examining Agent Cox. Wagner's proffer indicates that he apparently grounded his motion to suppress on the allegation that any sale of drugs by Dinitz was done at Agent Cox's suggestion. However, Wagner was unable to develop a connection between this allegation and any suppression issues.

10. The opening statement was frequently argumentative. Additionally, any discussion of the alleged extortion attempt would have been patently improper, since Wagner had no grounds for belief that Agent Cox could be connected to the extortion attempt. See note 11, *infra.* The ABA Standards for Criminal Justice provide:

In his opening statement a lawyer should confine his remarks to a brief statement of the issues in the case and evidence he intends to offer which he believes in good faith will be available and admissible. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing such evidence will be tendered and admitted in evidence.

ABA Standards Relating to the Administration of Criminal Justice, The Defense Function, § 7.4 (1971). The Florida Code of Professional Responsibility also states that

[i]n appearing in his professional capacity before a tribunal, a lawyer shall not (1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence.

DR 7-106(c)(1).

had such evidence [11], the court ordered him to leave the courtroom, characterizing his opening statement as "plain character assassination" and "the worst exhibition I have ever heard . . . since I have sat on the bench."

Given this sequence of events, it seems clear to us that the district court acted well within the scope of its discretion when it ordered Wagner to leave the courtroom. The disruptive effect of Wagner's conduct is evident when we consider that the court was forced to delay the beginning of the trial to hear testimony on a suppression motion that was utterly frivolous, to warn Wagner repeatedly about specific instances of misconduct, and to send the jury out of the courtroom no less than three times during the course of Wagner's opening statement.[12] Even after the district judge dismissed Wagner, Dinitz still had two lawyers (Mr. Meldon and Professor Baldwin) present; it was clear at the time that he would not be deprived of the advice of counsel as to what his available alternatives would be. Under these circumstances, it was no abuse of discretion for the district judge to order Wagner to remove himself.[13]

11. Two FBI agents had investigated the alleged extortion attempt. During the investigation the agents had attempted to trap the extortionist by leaving an envelope filled with paper at the proposed pick-up spot. The spot was kept under surveillance. Eventually someone picked up the envelope, but he was not apprehended. The agent who saw him, however, described him to the court, and he did not in any way resemble Agent Cox. Wagner admitted that he had neither seen the FBI agents' physical description of the man who picked up the envelope nor talked to the agents who investigated the matter.

12. The ABA Standards prescribe five separate alternatives by which a judge may seek to control disruptive conduct in a criminal trial:

When an attorney causes a significant disruption in a criminal proceeding, the trial judge, having particular regard to the provisions of section 6.3, should correct the abuse, and if necessary, discipline the attorney by use of one or more of the following sanctions:
(i) censure or reprimand;
(ii) citation or punishment for contempt;
(iii) removal from the courtroom;
(iv) suspension for a limited time of the right to practice in the court where the misconduct occurred if such sanction is permitted by law;
(v) informing the appropriate disciplinary bodies in every jurisdiction where the attorney is admitted to practice of the nature of the attorney's misconduct and of any sanction imposed.

ABA Standards Relating to the Administration of Justice, The Function of the Trial Judge § 6.5 (1972). The Standards also provide that the judge "should ordinarily impose the least severe sanction appropriate to correct the abuse and to deter repetition." *Id.* at § 6.3. We are convinced that it was reasonable for the district judge to conclude that the removal of Wagner was the least severe sanction appropriate under the circumstances. The judge had verbally reprimanded Wagner several times, and these reprimands had done little to deter Wagner's misconduct. Certainly, a citation for contempt may have been in order; as Chief Justice Burger has noted,

[h]ere the misconduct of the attorney, Wagner, was not only unprofessional *per se* but contemptuous in that he defied the court's explicit order. Far from "overreacting" to the misconduct of Wagner, in my view, the trial judge exercised great restraint in not citing Wagner for contempt then and there.

*United States v. Dinitz*, 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (1976) (concurring opinion). But there is no rigid requirement that the use of the contempt sanction chronologically precede the use of the removal sanction in every case. All that sound discretion requires is that the judge impose that sanction which is (in the words of the ABA Standards) "appropriate to correct the abuse and to deter repetition." By the time Wagner was finally ordered to leave the courtroom, the repetitious character of his misconduct was well established, and there is little reason to believe that a contempt citation would have significantly served to deter the repetition of that misconduct.

13. Dinitz cites *Sanders v. Russell*, 401 F.2d 241 (5th Cir. 1968), as authority for the proposition that the district judge overreached his authority when he ordered Wagner to leave the courtroom. *Sanders* was a mandamus proceeding in which a panel of this court ordered the district judge to allow, contrary to certain local rules, a *pro hac vice* appearance by out-of-state counsel in a civil rights case. Although recognizing that the district courts enjoy broad discretion with respect to *pro hac vice* appearances, the panel found that the Southern District of Mississippi's rather restrictive rules on *pro hac vice* appearances contravened the congressional intent expressed in the various civil rights acts. Of course we agree that judicial discretion in this area is circumscribed by the intent of Congress. *See* 28 U.S.C. § 2071 (1970).

The next exercise of discretion which we must consider occurred on February 23, 1973, about a week after the mistrial. On that date, the court heard a motion by one of Dinitz's remaining attorneys, Mr. Meldon, in which Mr. Meldon requested permission to withdraw from the case. Mr. Meldon's motion cited "irreconcilable differences" between him and Dinitz [14]. The court asked Dinitz if he objected to Mr. Meldon's withdrawal, and Dinitz refused to answer, insisting that he wished to consult with Wagner before proceeding any further. The court then granted Mr. Meldon's motion.

■ We find no abuse of discretion here. Although a date for Dinitz's second trial had not yet been set, the court had stated that there would be no retrial during the current term; thus, it was clear that Dinitz would have ample opportunity to secure another attorney. In fact, the court even went to some lengths to explain to Dinitz, a third-year law student, that the court would appoint new counsel if Dinitz were unable to afford one [15]. Moreover, Dinitz was still not left completely without counsel, since Professor Baldwin had not withdrawn from the case. Under these circumstances, it was no abuse of discretion for the court to grant Mr. Meldon's motion to withdraw.

■ The next exercise of discretion which we must consider occurred on March 26, 1973. Some weeks prior to that date, Dinitz had filed a written motion for the reinstatement of Wagner. On March 26, the district court denied that motion. Here again, we conclude that the court was well within its discretion in doing so. The court had before it no formal motion or affidavit from Wagner evincing an intent to forbear further misconduct. In fact, the record shows no communication from Wagner to the court of any kind. Nor did Dinitz's motion contain any statements which would indicate a desire on Wagner's part to ameliorate the situation; factually, it contained little more than the bald statement that "Maurice Wagner, Esq., has advised the Defendant that he is prepared at any time to represent the Defendant in this cause." In short, there was nothing before the district court by which it could have inferred that Wagner's conduct would be any less reprehensible at the second trial. Moreover, to deny Wagner's reinstatement would not have forced Dinitz to proceed to trial without a lawyer. Although a precise date for the second trial had not yet been set, it was clear that Dinitz would have ample time within which to retain or seek the appointment of new counsel [16]. Given the absence of any curative action on Wagner's part, the district judge was wholly justified in refusing to allow Wagner to reappear.

■ Finally, we must consider the district court's actions on April 16, 1973, the day that Dinitz's trial began. On that day, Dinitz again moved for the reinstatement of Wagner; again there was no communication to the court from Wagner himself, either by motion or affidavit; and again the motion to reinstate Wagner was denied. It was no abuse of discretion to do so. Dinitz had received his formal notice of the

However, we are unaware of any acts of Congress which would allow us to analogize *Sanders* to Dinitz's case.

14. More specifically, the motion cited irreconcilable differences and added that Dinitz's "legal education has nurtured in [Dinitz] certain notions as to the proper method of proceeding in the defense of this cause, thus making the aforementioned irreconcilable differences impossible of resolution or compromise."

15. The court told Dinitz:
If you are unable to hire an attorney, if you are unable to pay costs and the necessary fees for any investigation services there is a

provision for the court to appoint competent counsel to represent you in this case at no expense to you, and at no cost to you, so if you get in that position to where you are unable to afford to hire one, you ought to notify the Clerk of this Court and a competent attorney will be appointed to represent you. I would suggest that you make that determination and advise the Court so that someone can be appointed to represent you at an early date so there will not be any delay.

16. As it turned out, Dinitz had fully three weeks in which to pursue these alternatives.

trial date on April 5. From that date he had eleven days to seek alternate counsel, either by hiring one himself or by requesting the court to appoint one. In fact, even though the trial was about to begin, the court was still willing to appoint counsel for Dinitz; Dinitz was advised of that fact, and he declined to have an attorney appointed.[17] Thus, absent any assertion that further disruption would not occur if Wagner were allowed to return, the court was left with virtually no choice but to allow Dinitz to represent himself and to proceed to trial. This is exactly what the court did, and it was far from an abuse of discretion.

In considering each instance in which the court refused to allow Wagner to appear, we are especially cognizant of the fact that this is not a case in which the court's removal of a defendant's attorney forced the defendant immediately to proceed *pro se* without an opportunity to secure alternate counsel. *See United States ex rel. Higgins v. Fay*, 364 F.2d 219 (2d Cir. 1966). After the original dismissal of Wagner, Dinitz had two months to secure another lawyer. Instead, he chose repeatedly to insist upon his contention that the district court had erroneously ordered Wagner off the case. The fact that Dinitz mistakenly disagreed with the district court on this point of law does not appreciably strengthen his position. The disruptive conduct of Wagner at the first trial thoroughly justified his removal; after that time, there was never any showing of contrition or reformation by Wagner; and Dinitz was time and again given the opportunity to secure another lawyer. Un-

der these circumstances, the requirements of the Sixth Amendment were more than satisfied.

Some two years after Dinitz's case came to trial, a panel of this court decided *In re Evans*, 524 F.2d 1004 (5th Cir. 1975).[18] In that case, an attorney had made a formal pretrial motion for admission *pro hac vice* in a criminal tax evasion case, and the district judge had denied the motion. The panel granted a writ of mandamus compelling the district court to admit the attorney. In doing so, the panel outlined certain procedural requirements applicable to *pro hac vice* motions [19] and declared that only misconduct "rising to the level of disbarment" would give a district judge the discretion necessary to deny a *pro hac vice* appearance.

▆▆▆ *Evans*, however, was substantially different from Dinitz's case. In the first place, *Evans* is wholly inapposite to the removal of Wagner during the first trial. *Evans* merely attempted to establish standards applicable to a *pretrial* motion to appear *pro hac vice*. In such a context, Sixth Amendment considerations, among others, necessarily restrict the scope of a trial court's discretion. Before a trial has begun, a court may have little first-hand knowledge of an attorney's competence (or lack thereof); moreover, since a pretrial hearing would not interrupt any ongoing trial proceedings, fundamental fairness may require such a hearing in most of these situations. Once an attorney has been admitted *pro hac vice* and a case has proceed-

---

17. At the opening of the proceedings, the following exchange occurred:

 THE COURT: Mr. Dinitz, you were advised sometime ago, this case was set for trial today. Do you have an attorney?
 MR. DINITZ: No sir, I don't.
 THE COURT: Do you wish the Court to appoint an attorney to represent you or to sit with you?
 MR. DINITZ: No, sir. I have watched a Court appointed attorney and he did not give it proper preparation. I would prefer not to have a Court appointed attorney.
 THE COURT: Do you understand, though, that since you have indicated earlier that you were unable to hire an attorney that you

have the right to have one appointed to represent you?
 MR. DINITZ: Yes, sir.

18. By our discussion here of *Evans*, we do not mean to imply that we feel it should be applied retroactively. Since, as we later point out, *Evans* is inapposite to Dinitz's case, we need not decide that issue here.

19. If a district court has evidence which may justify a denial of admission *pro hac vice, Evans* calls for notice of specific charges and a hearing on the record to allow the attorney an opportunity to defend himself.

ed to trial, however, the considerations are quite different. The interests of justice demand that a judge have a measure of discretion to take steps necessary to ensure that order is maintained. Unnecessarily to limit the judge's discretion would be to threaten the rights of not only the government, but the defendant as well. And when, as here, an attorney's conduct demonstrates a substantial likelihood of continued disruption of the trial proceedings, we cannot say that it is an abuse of discretion to order that attorney to leave the courtroom.

 Furthermore, the *Evans* requirements could not have applied to the court's refusals to reinstate Wagner before the second trial had begun. *Evans* at least requires an attorney to make some showing to the court that he is qualified and ready to appear *pro hac vice*. If the court then decides not to admit him, the attorney may · well be entitled, in most cases, to hear the court's reasons for denying him admission and to defend his qualifications at a formal hearing. But in Dinitz's case, Wagner made no attempt to secure his own reinstatement. Although the court, in banishing him from the first trial, had told him that "you will leave this Courtroom immediately and you will never practice law in this Court again," the court may well have reconsidered its judgment under less emotional circumstances. The point is that the court never had a chance to reconsider because it was never presented with any reasons for doing so. As the court itself stated at the beginning of Dinitz's second trial,

> [i]f Mr. Wagner wishes at some date to request the right to be admitted to this bar the Court will take it up at that time, but he is not a member of the bar of this Court and will not be allowed to practice for two reasons, one, because of what has transpired at the earlier proceeding, and two, because he had never made application to be admitted to this bar.

In conclusion, *Evans* is of no help to Dinitz. Even if we were to decide that the *Evans* standards should receive retroactive application, those standards would not compel us to conclude that the district court had at any time violated Dinitz's Sixth Amendment rights.

### III

 We will now proceed with the remaining issues raised by Dinitz in this appeal. First, he argues that the district court erred in preventing his cross-examination of Agent Cox through the use of Cox's testimony at the earlier unrelated trial. To the extent that it is ever admissible, extrinsic evidence to attack credibility is usually subject to the discretion of the trial judge. *See United States v. Banks,* 475 F.2d 1367 (5th Cir. 1973); 3 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 608[05]; Fed.R.Ev. 608(b). Furthermore, the earlier testimony bore no relationship to any issue in this case. Dinitz simply wanted to show that, at an earlier time, Cox had made an inconsistent statement under oath, nothing more. Clearly, the district judge did not abuse his discretion in precluding the inquiry.

 Dinitz next argues that the district court erred when it denied his motions made before and during the trial to inspect, *in camera,* the records of the FBI investigation of the extortion attempt. The contention is that the recorded description of the man who picked up the payoff envelope might have inculpated Agent Cox and thus might have tended to exculpate Dinitz. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny do not stand for the proposition that due process requires an *in camera* inspection of government files whenever a defendant requests such an inspection. The *Brady* cases at least require some indication that the files will contain information "material either to guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1197. Here there was no such indication. Dinitz's estimation of what the FBI records would show was highly speculative, and, moreover, was more than adequately rebutted by the testimony of the two FBI agents who investigated the al-

leged extortion attempt and advised the court under oath that Cox was not involved.[20]

Dinitz's final contention is that the district court erred in not allowing him to develop the extortion incident in the presentation of his defense. At the commencement of the trial the court had admonished Dinitz that a hearing would have to be held out of the jury's presence if he desired to go into that matter. Dinitz first requested such a hearing after calling three witnesses to the stand. After excusing the jury, the court asked Dinitz what he proposed to show. Dinitz stated that he felt Agent Cox could be connected with the extortion attempt because the telephone voice of the extortionist bore a "tremendous similarity" to the voice of Agent Cox. This was the first time in the entire case that anyone purported to link Cox to the telephone call.[21] Dinitz did not commit himself to testify to this fact, nor did he explain how the alleged extortion attempt fit into his defense.[22] On his own initiative the district judge questioned the two FBI agents who had investigated the extortion complaint. Both had been subpoenaed by Dinitz himself, presumably to testify in his behalf. As at Dinitz's first trial, they testified that the man who picked up the envelope bore no resemblance to Agent Cox. In fact, they had no information of any kind that would implicate Cox. After the agents testified, the court again denied Dinitz's blanket request for an inspection of the FBI files on the extortion investigation.[23] When Dinitz made no further showing, the court denied his request to develop the extortion issue at that stage of the proceedings. When the jury returned, Dinitz called several other witnesses, including Agent Cox. He chose not to take the stand himself, and he made no further requests to present evidence on the extortion attempt.[24]

Dinitz never succeeded in laying a predicate for the introduction of the alleged extortion attempt. His proffer, developed during the course of the two trials, consisted initially of the representation of his counsel that there was no evidence of Agent Cox's involvement. There was no indication when the attempted extortion was first reported that Cox had made the telephone call to Dinitz, and the FBI investigation disclosed that someone else had picked up the envelope. All that remained was Dinitz's announcement to the court, late in his case, of the similarity between the voices of the caller and Cox. But he was evidently unwilling to take the stand to assert his innocence and to claim that Cox had framed him.

■ We conclude that the proffer was not sufficient to require the trial judge to permit the development before the jury of this collateral matter through the examination of Agent Cox or the FBI agents. *See United States v. Higgins,* 362 F.2d 462 (7th Cir.), *cert. denied,* 385 U.S. 945, 87 S.Ct. 316, 17 L.Ed.2d 224 (1966). Of course, Dinitz could have sought to introduce the episode through his own testimony, but the case never reached that posture. We find, therefore, that Dinitz's final contention is without merit.

## IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**20.** It should also be remembered that the government files which Dinitz sought were not those used to prosecute the case against him but rather those used in an investigation into an event which was at best collateral to Dinitz's case.

**21.** See note 3, *supra.*

**22.** For example, Dinitz never alleged that he was framed. His own witnesses testified that he was with Cox at the scene of the drug transaction on the day it occurred, and he did not deny it in his closing argument to the jury.

**23.** Dinitz made no requests for any Jencks Act statements the agents may have made, and we do not view his request for an inspection of the files as such a demand. *See* 18 U.S.C. § 3500 (1970).

**24.** However, he did try to allude to it in closing argument to the jury, but the court intervened.

CLARK, Circuit Judge, with whom DYER and GEE, Circuit Judges, join, concurring:

I concur in the result and Parts I, III and IV of Judge Tjoflat's opinion for the en banc court.

In my view, the circumstances of Dinitz's second trial are so similar to those displayed in *In re Evans,* 524 F.2d 1004 (5th Cir. 1976), that the attempt in Part II to distinguish *Evans* must fail. *Evans'* attorney was not refused the right to appear *pro hac vice* because of any generalized activity but because of his conduct in prior, related cases in the same court. As I see it, the attempt by Dinitz to have Wagner reinstated as his trial attorney at the second trial is squarely within the facts and rule of *Evans.*

Even if I am wrong about this, the failure to modify *Evans* unnecessarily beclouds the applicable rule for future cases involving motions for admission *pro hac vice.* The majority leaves the trial courts of this circuit without guidance as to how future cases of this kind should be handled. Have *Evans'* rules of procedure and substance been supplanted *sub silentio* by a return to the vague standard of abuse of discretion in only this exact case, in some cases, or in every case? Are the standards for admissions *pro hac vice* bifurcated; *i. e.,* one standard for civil rights cases in the Southern District of Mississippi and another for other cases and courts? *Evans* should be modified and this is both the time and the forum for it.

For example, we could establish as the rule that a court may deny permission to appear *pro hac vice* to an attorney who has committed acts in this or another court that warrant disciplinary action under the Disciplinary Rules of the Code of Professional Responsibility, unless such denial would result in clear prejudice to the attorney's client. If we thus modify the *Evans — Sanders* standard, it would permit a trial court to deal effectively with disruptive conduct without engaging in speculation about the *degree* of disciplinary action that a state bar committee would consider sufficient for disbarment.

Failing in my ability to distinguish *Evans* on its facts and lacking a modification of its rule, I cannot concur in all the majority writes in Part II. However, under the factual conclusions now established by the Supreme Court's opinion, the first trial actions of Wagner warranted his dismissal there and Dinitz showed no substantial prejudice in the deprivation of Wagner's services at his retrial. I, therefore, concur in the result.

JOHN R. BROWN, Chief Judge, concurring, with whom COLEMAN and GEE, Circuit Judges, join:

I concur in Judge Tjoflat's opinion and in the result except that I agree with Judge Clark's separate opinion that *In Re Evans* cannot be squared with this result. I consider that whatever vitality *In Re Evans* had has necessarily been dissipated by the present en banc decision. Of course, *In Re Evans* is still on the books, but except for the highly restrictive application to the unusual situation described in that opinion, our action today affirms to District Judges that they are not circumscribed from exercising their constitutional discretion to assure deportment in their courts.