UNITED STATES of America,
Plaintiff–Appellee,

v.

Anna Lou STUCKEY, a/k/a Clara Davis, Defendant–Appellant.

Nos. 89–8268 and 89–8449
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

Oct. 19, 1990.

Fred A. Schwartz, Adorno & Zeder, P.A., Miami, Fla., for defendant-appellant.

Deborah A. Griffin, Asst. U.S. Atty., Macon, Ga., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY and COX, Circuit Judges.

PER CURIAM:

Anna Lou Stuckey appeals from her convictions at the hands of a jury for conspiracy to possess with intent to distribute cocaine (count one); for aiding and abetting the possession with intent to distribute cocaine (count two); and for aiding and abetting travel in interstate commerce in aid of racketeering (count three). She raises three arguments for reversal: (1) the evidence was insufficient to convict; (2) the district court erred in failing to instruct the jury that an out-of-court statement used to impeach a witness could not be considered to prove the truth of its contents; and (3) the district court erred in disqualifying appellant's "primary" trial counsel (purportedly Fred A. Schwartz) and requiring her to proceed to trial with "local" trial counsel (Richard A. Coleman). Finding no merit in any of these arguments, we affirm.

From the evidence adduced at trial, viewed in the light most favorable to the Government, the jury could find that appellant and Gary Bernard White, her codefendant, who pled guilty to all three counts of the indictment, were engaged in the business of hauling substantial amounts of cocaine from south Florida to Atlanta, Georgia for a drug-trafficking syndicate. They were caught when, on January 19, 1989, during one of their trips from south Florida to Atlanta, the Georgia Highway Patrol stopped their van on I–75 in Houston County, Georgia and found fifty-five packages, each containing a kilogram of cocaine, hidden in a secret compartment under the rear deck of the vehicle. Given the other tangible evidence the police seized from appellant and White on that occasion, which indicated that appellant and White had made several brief trips from Atlanta to Miami and back to Atlanta during the preceding seven months, a reasonable jury could readily find appellant guilty as charged in the indictment. We therefore reject her first ground for reversal.

Appellant's second argument deals with the trial judge's handling of an out-of-court statement the Government introduced to impeach a witness. She says that the judge erred in failing to give the jury a limiting instruction as to the purpose of the testimony, although she did not request one. As the Government notes in its brief, the court, in its charge to the jury at the conclusion of the trial, properly instructed the jury on the use it could make of impeachment testimony, and thereafter, in arguing the case to the jury, the prosecutor did not circumvent that instruction by urging the jury to accept such testimony as proof of its factual recitations. The question, therefore, boils down to this: Did the trial judge commit plain error in failing to give a limiting instruction on his own initiative when the impeaching testimony came before the jury? The answer, obviously, is no. There being no merit in appellant's second argument, we turn to her third, and final, point concerning the court's disqualification of the lawyer who, she represents,

was supposed to act as her lead counsel at trial.

After discovering the cocaine in the secret compartment of the van, the Georgia Highway Patrol took appellant and White into custody and turned them over to agents of the federal Drug Enforcement Administration (DEA) in Macon, Georgia. The DEA thereafter filed a criminal complaint against appellant and White, and, four days later, a federal magistrate in Macon held a hearing to determine whether there was probable cause to bind appellant and White over to the grand jury and to detain them in the interim. At the hearing, Richard A. Coleman, an Atlanta lawyer, represented appellant; David Botts, an attorney also from Atlanta, represented White. Coleman, in response to the magistrate's inquiry as to whether he was appellant's lawyer, stated that he was. Botts told the court that he was White's lawyer.

The magistrate found probable cause and ordered appellant and White detained. Two days later, on January 25, the grand jury returned the instant indictment. The defendants were arraigned on February 1, and on February 10, Coleman moved the court to admit appellant to bail. The court denied his motion, and appellant remained in custody. Coleman also moved the court, on February 10, to suppress the evidence seized at the time of appellant's and White's arrests, and to grant the defendants separate trials. (Botts, in behalf of White, also moved to suppress this evidence, but he did not join in Coleman's motion for separate trials.) Separate trials were necessary, Coleman represented to the court, so that the defendants could testify and exculpate one another. According to Coleman, appellant contemplated taking the stand in White's defense and White planned to take the stand in her defense; the defendants would not testify, however, if they were tried together.

On March 3, Fred A. Schwartz, an attorney practicing in Miami, Florida, filed a notice of appearance "as co-counsel" for appellant. In his notice, he stated that he "agrees to represent [appellant] for proceedings arising out of the transaction with which [appellant] is presently charged in the United States District Court in and for the Middle District of Georgia."[1] That same day, Chief Judge Wilbur D. Owens, Jr., heard appellant's and White's motions to suppress. Schwartz did not appear for the hearing; rather, Coleman, alone, appeared for appellant. Botts appeared for White. At the end of the hearing—after the court had heard the evidence and argument of counsel—the prosecutor, Deborah G. Fowler, announced: "Briefly, we'd like to bring one other matter to the court's attention, we were *handed this morning* a Notice to Appear of a Fred Schwartz of Miami and of course, this case is set [for trial] for March 20th and we would just like to request that if he is admitted to join in counsel for [appellant] that that not ... delay ... the trial of this matter." (In the certificate of service attached to the Notice of Appearance he filed on March 3, Schwartz stated that he had *mailed* the Notice of Appearance to the prosecutor, and Coleman and Botts, *on February 21*.) On hearing this statement from the prosecutor, Judge Owens engaged in the following colloquy with Coleman:

THE COURT: What is the situation there, Mr. Coleman?

MR. COLEMAN: Well, Your Honor, he has been associated with myself in this matter. I will—I guess we'll decide who will be lead counsel in that regard. I do not believe he has any conflicts and it is my understanding he does have no conflicts with the March 20th trial date and I believe that there will be no problem or conflict in him appearing. I have left a copy of [Schwartz' Notice of Appearance] with the Court as well with the Bailiff in front of you, Your Honor. I'd like to point out though, by mistake, one of the—the one filed with the Court said that they were served on the 21st [of February]; they were not served on the 21st, they were both served on Ms. Fowl-

---

**1.** At the same time, on March 3, Coleman and Schwartz filed a "Motion to Appear Pro Hoc Vice," in which they represented that appellant wished Schwartz to appear in the case as her co-counsel, along with Coleman.

er [the prosecutor] today by myself and for the record, I'd just like to correct that misnomer. I've corrected that on your copy but it's not corrected on the Clerk's Office copy and for the record, I'd like to state that. . . .

. . . .

THE COURT: And I will allow Mr. Schwartz to appear provided that his appearing does not delay the trial of the case. Will you so communicate with him?

MR. COLEMAN: I will, Your Honor. Will the Court be entering an order in that regard or shall I prepare one for the Court?

THE COURT: We routinely do not enter orders for that purpose.

MR. COLEMAN: I will communicate that to Mr. Schwartz, Your Honor.

On March 6, Judge Owens' magistrate denied appellant's motion for separate trials; on March 14, Judge Owens denied appellant's motion to suppress (and White's motion as well). The next day, White appeared before Judge Owens and pled guilty to the first count of the indictment pursuant to a plea agreement which called for him to cooperate with the Government and to testify for the Government at appellant's trial. Judge Owens accepted White's plea, and White submitted to an interview by agents of the DEA.

During the interview, the agents asked White where he got the funds to hire his attorney, Mr. Botts; they did so because the pretrial services report prepared by the district court's probation office to aid the court in deciding whether, and on what conditions, to admit the defendants to bail indicated that neither defendant had the resources to hire an attorney. White told the agents that he did not know who had paid Mr. Botts and, moreover, that Botts would not tell him. Following the interview, one of the agents approached Botts on the subject, and Botts said that appellant's lawyer had paid him. Given these revelations, the Government concluded that a third party, probably the organizer or the financier of the drug-trafficking syndicate, had hired both Botts and Coleman and that appellant might not have conflict-free counsel. The Government therefore moved the court for an emergency hearing on the matter; among other things, the Government asked the court to set aside White's guilty plea, to determine the source and the amount of the fees that had been paid to Botts and Coleman, and, following a Federal Rules of Criminal Procedure 44(c) inquiry,[2] to ensure that the defendants had counsel capable of providing them effective, conflict-free assistance as required by the sixth amendment. The Government filed its motion for an emergency hearing on March 16; Judge Owens held the hearing on March 17 (on Friday), three days before appellant's trial was to begin (on Monday). (Sometime before the hearing began, White withdrew the guilty plea he had entered on March 15 pursuant to a plea agreement with the Government and, proceeding without a plea agreement, tendered a plea of guilty to each count of the indictment. Although the record of this proceeding is not before us, it is apparent from

---

**2.** Fed.R.Crim.P. 44 provides:

**Rule 44. Right to and Assignment of Counsel**

(a) **Right to Assigned Counsel.** Every defendant who is unable to obtain counsel shall be entitled to have counsel assigned to represent that defendant at every stage of the proceedings from initial appearance before the federal magistrate or the court through appeal, unless that defendant waives such appointment.

(b) **Assignment Procedure.** The procedures for implementing the right set out in subdivision (a) shall be those provided by law and by local rules of court established pursuant thereto.

(c) **Joint Representation.** Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

what is before us that Judge Owens accepted the plea.)

The hearing on the Government's motion began at 9:00 a.m. in Judge Owens' chambers; present were Judge Owens and attorney Botts. Referring to the Government's allegation that appellant's attorney had paid Botts to represent White, Judge Owens said that he had a duty to inquire as to whether, if the Government's allegation were true, Mr. White had been receiving conflict-free counsel. Judge Owens began his inquiry by asking Botts, over Botts' objection, to reveal who had hired him to represent White and how much that person had paid him. Botts stated that he undertook White's representation after being contacted by Coleman; Coleman asked him to represent White—for a fee of $25,000— and he accepted the assignment. He received the fee in installments. First, Coleman paid him $10,000. Then, Schwartz paid him $5,000. The final payment, $10,-000, came from a man who identified himself to Botts' secretary as "Mr. Brown" and said that he had come to Botts' office "to pay the remainder of Mr. White's fee." Botts said that he told Mr. Brown that he would have to have his full name, so that he could "file reports on it," and Brown replied: "Well then, you can write my name down as Frank Smith and I don't want a receipt." According to Botts, "that was it," and Brown gave him $10,000 in cash.

At this point, the court excused Botts, and Coleman entered Judge Owens' chambers—to face the same inquiry. Coleman, after objecting to the questions that he anticipated the court would ask, said that he agreed with a man (whose name he did not reveal), who hired him, that he would represent appellant for $20,000, and that he had received $9,300 of that amount. Coleman also said that the man who hired him gave him $10,000 to pay Botts (the initial installment of the fee Botts was to receive for representing White), and that he, in turn, gave the money to Botts.

After questioning Coleman, Judge Owens excused him and examined appellant and White separately, beginning with White. Judge Owens explained that the purpose of the inquiry was to ensure that White had effective, conflict-free counsel. He told White that, according to the information he had received from counsel, White's "lawyer had been ... selected [and paid for] by someone else, that ... Mr. Coleman was contacted by a third person, he [Coleman] came to Macon and talked to both you and your codefendant and found that he couldn't represent both of you, so then he went and asked Mr. Botts to come and represent you." White responded that such was the case. After ensuring that White understood why an accused needed conflict-free counsel—so that counsel could provide the accused the effective representation the Constitution requires—and after White stated that he felt "very confident" with Mr. Botts' representation, Judge Owens ended the inquiry.

After excusing Mr. White, Judge Owens called appellant to his chambers. He told her why she was there—so that he could determine whether she had conflict-free counsel who could give her the representation the Constitution required—and she said she understood. Judge Owens asked her who had hired and paid her attorney, Coleman; she replied that her family had done so. She denied that Coleman had been hired and that his fees had been paid by someone in Miami, insisting, over and over, that her "family" had hired Coleman. Judge Owens, obviously disbelieving her, told her that if she wanted to discharge Coleman and lacked the funds to hire a new attorney, the court would relieve Coleman and provide her counsel. Appellant said that she wanted Coleman to continue; "right now, I'd like to keep him because he's familiar with me and my case." Judge Owens, apparently satisfied with her answer, concluded the inquiry.

At this point, Judge Owens had the prosecutors (Fowler and Calhoun) and defense counsel (Coleman and Botts) brought to his chambers. He told them that he did not "perceive at the moment any necessity for the court to relieve [Coleman or Botts] or making any change" in the defendants' representation. Then, he turned to the question of whether Coleman's and Botts' fees constituted the proceeds of drug trafficking and therefore ought to be deposited in

the registry of the court. He raised the question because experience had taught him that south Florida drug traffickers frequently arrange to hire attorneys to represent those in their organizations who happen to get arrested. Judge Owens deferred resolution of the question, however, and concluded the session by stating that "if it turns out that the money that you [Coleman and Botts] have been paid is forfeitable, then the Court will cause you to be compensated under the Criminal Justice Act."

Following this chambers conference (actually sometime after the lunch hour), Judge Owens called attorney Schwartz in Miami. The court reporter took down the conversation that ensued. Judge Owens told Schwartz that he had learned from counsel that Schwartz had paid all or a part of Botts' fee for representing White. Schwartz, in response, said that, after appellant's and White's arrests, he had gone to Georgia to see Coleman (who had once clerked for Botts). Coleman had already gotten Botts into the case. Schwartz then met with Botts. Botts said that Coleman had paid him only part of his fee and he wanted the rest. Schwartz said that he did not know where Coleman got the money to pay Botts. Schwartz added that the "gentleman [who] came to me and ... paid my fee ... also said ... 'here is $5,000 for Mr. Botts.' " Schwartz told the gentleman that he was not the one who had retained Botts to represent White, but that he would pass the money along to Botts. He thereafter mailed Botts his, Schwartz', check for $5,000. Schwartz told Judge Owens that he had never instructed Botts on how to handle White's defense; all that he did was to act as a conduit for the payment of part of Botts' fee.

Judge Owens asked Schwartz how much he had been paid. Schwartz said that he received "$5,000 for expenses for me to go to Georgia, meet with Mr. Coleman, find out what the case was about and ascertain whether I felt I could come in and represent the gentleman." On a second occasion, he "received $15,000 of which $5,000 was sent to Mr. Botts so that brought me

to a total receipt of $15,000 for myself. I received in addition to that another $10,-000.... So I have received a total of $25,-000...."

Schwartz told Judge Owens that he perceived no conflict that would preclude him from representing appellant. Judge Owens replied that "because of the potential for conflict [he was] required to disqualify [him] from further participation in the matter." He said that he would notify appellant of his ruling.

At 4:30 p.m. that day, Judge Owens had appellant brought to his chambers. He told her that he had spoken with Schwartz and learned that Schwartz had "transmitted and paid money, part of the fee in question, to both [her] lawyer [Coleman] and [White's] lawyer, and that the money came from somebody who stopped in [Schwartz'] office in Miami." Judge Owens then asked appellant when she first heard of Schwartz. "Was it after Mr. Coleman saw you? How long was it before you even heard from Mr. Schwartz?" Appellant said: "Well, I just understand that he was working with Mr. Coleman, kind of introductory." Judge Owens told appellant that "because of the fact that Mr. Schwartz is in Miami and received money from somebody, unknown to the court, which he has sent part of to each lawyer [Coleman and Botts] ... there is the danger that Mr. Schwartz has [an] obligation to somebody other than you; that whatever decisions he might make as a lawyer in your case could possibly be influenced by thinking of somebody other than you." For this reason, Judge Owens explained, he had advised Schwartz that he could not represent appellant at her trial. He told her that if she felt that Coleman could not "adequately handle" her case, he would obtain substitute counsel for her. Appellant, responding, said: "Well, as I told you this morning, I'll stick with Mr. Coleman...."

After conferring with appellant, Judge Owens met with Coleman and related his conversation with appellant and Schwartz. Coleman told the judge that he was not prepared for trial, that "Schwartz was to have been lead counsel," and that he was going to appeal the ruling disqualifying Schwartz. Coleman also indicated that if

Judge Owens did not postpone the trial, he would ask this court to stay further proceedings in the case pending its disposition of the appeal.

Judge Owens refused to postpone trial and, after observing that the disqualification of Schwartz was not appealable, told Coleman that the case would proceed to trial as scheduled. The trial began the following Monday, March 20, and, on March 22, the jury found appellant guilty as charged.

Appellant contends that the trial court committed reversible error when it disqualified Schwartz. According to appellant, the disqualification deprived her of her sixth amendment right to counsel of her choice. She contends, in addition, that even if the court was correct in finding that Schwartz had a conflict of interest, the court denied her the right to waive the conflict.

■ The sixth amendment right to counsel does not give an accused the right to subvert the judicial process. *See United States v. Sexton*, 473 F.2d 512, 514 (5th Cir.1973);[3] *cf. United States v. Dinitz*, 538 F.2d 1214, 1219–20 (5th Cir.1976) (en banc), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977). In this case, as we observed in rejecting appellant's argument that the evidence was insufficient to convict, it is obvious that appellant and White were working as interstate couriers for a large drug-trafficking syndicate—hauling substantial quantities of cocaine from south Florida to Atlanta. It is also obvious that those running the syndicate hired Mr. Schwartz, Mr. Coleman, and Mr. Botts. As Judge Owens observed, the arrangement had a certain "odor" about it. The inference is inescapable that the syndicate provided appellant and White counsel because they wanted to "control" them—to prevent them from cooperating with the Government and revealing the identities of those in the syndicate who gave them their marching orders. Such control can be devastating to the rights of an accused; rather than getting credit through a charge bar-

gain with the prosecutor or a reduced sentence from the trial judge, the accused stands mute and takes all the blame.

■ Judge Owens' findings of fact—both explicit and implicit—are firmly rooted in the record; thus, we do not disturb them. What is left for us to decide is whether the trial judge—to ensure the appearance of justice, if not justice itself—abused his discretion in disqualifying Schwartz, who had filed an appearance in the case as Coleman's co-counsel, or in refusing to let appellant waive the conflict manifest in Schwartz' obvious allegiance to the Miami "gentleman" who hired him. It requires no citation of authority for us to conclude that the judge did not abuse his discretion—that he did not deny appellant her sixth amendment rights.

Appellant received a fair trial at the hands of Mr. Coleman—the lawyer appellant told Judge Owens she wanted to "keep ... because he's familiar with me and my case." Her conviction is, therefore,

AFFIRMED.

---

3. *In Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.