**In re James FINKELSTEIN,
Respondent–Appellant.**

**No. 89–8177.**

United States Court of Appeals,
Eleventh Circuit.

May 23, 1990.

Eugene C. Black, Jr., Black & Black, Henry C. Custer, Albany, Ga., for respondent-appellant.

Walter E. King, III, Macon, Ga.

Before VANCE[*] and KRAVITCH, Circuit Judges, and LYNNE[**], Senior District Judge.

[*] Judge Robert S. Vance was a member of the panel which heard oral argument but due to his death on December 16, 1989, did not participate in this decision. This case is decided by a quorum. *See* 28 U.S.C. § 46(d).

[**] Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

LYNNE, Senior District Judge:

## INTRODUCTION

James Finkelstein ("Finkelstein") appeals a federal district court's order suspending him from the practice of law for unprofessional conduct. An independent review of the record convinces us that Finkelstein could not have been on notice that the court would condemn the conduct for which he was suspended. We therefore reverse and remand with direction.

## STATEMENT OF THE CASE

Finkelstein represented eleven individual plaintiffs in employee discrimination suits brought against Procter & Gamble Cellulose Company,[1] asserting claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. These cases were consolidated for trial before Judge Duross Fitzpatrick. After a lengthy trial, on December 21, 1988, the jury returned a verdict in favor of two of the eleven plaintiffs.[2] The court set January 6, 1989, as the hearing date for the damages portion of the trial and invited the parties to use the interim to discuss settlement.

On December 24, 1988, after the conclusion of the liability portion of the trial but before the issue of damages had been determined, Finkelstein wrote a letter to Powell McHenry ("McHenry"), General Counsel for Procter & Gamble, attempting to negotiate a settlement. The letter began with an overview of the trial proceedings relative to all eleven plaintiffs and stated the terms for settlement in each of the cases. Finkelstein next suggested certain actions that should be taken by Procter & Gamble in the future in order to prevent similar lawsuits. He further requested attorney's fees of $500,000 for the reasonable amount of time spent on the cases or alternatively, an amount equal to the fees paid to defense counsel for Procter & Gamble.

The remainder of the letter became much more coercive as Finkelstein explained why he thought it would be in Procter & Gamble's best interest to settle the cases. The letter read in pertinent part:

You may ask me why Procter & Gamble should settle these cases at this juncture. That is a good question. Some answers which presently suggest themselves are:

(1) I intend to do everything I can to obtain jury verdicts at the damages phase which will at least double the above amounts totaled—I have a few aces up my sleeve to play in the damages phase, courtesy of trial testimony from Mr. Richards, Mr. Sichelstiel, and Mr. Hooper;

(2) I intend to obtain Title VII damages for all plaintiffs and E.R.I.S.A. damages for Mr. Porter which will come close to the above amounts, although the attorney's fees should be higher;

(3) Any company which has the hubris to sue for libel over the moon and stars logo has some concern for its public image, and more litigation will only tarnish the image further;

(4) The NAACP and SCLC might find it interesting that your company fought hard and successfully to keep testimony from the jury in this case that a black manager at your Foley, Florida plant had to hold his urine all day to avoid the racial epithets on the walls of the restroom, the pounding on the stalls when he used the restroom, and the objects thrown over the sides of the stalls when he used the restroom. They would also find it interesting that he had to wear his hard hat to keep from being injured from debris thrown at him by white workers;

(5) A young lady I grew up with in Johnstown, Pennsylvania named Lucy Spiegel is interested in good stories when I bump into her at home—she formerly was a producer for 60 Minutes and now is a producer for ABC news;

---

1. Formerly Buckeye Cellulose Corporation.

2. In the other nine cases, the jury found in favor of the defendants as to violations of 42 U.S.C.

§ 1981. The plaintiffs' Title VII claims apparently remained pending at oral argument.

(6) Any company which spends $1.6 billion per year on advertising would not be enthusiastic over nationwide publicity that it has been found guilty of intentional race discrimination;

(7) There are more cases coming, and not only at your Oglethorpe, Georgia plant; I have been contacted by other persons charging race discrimination and those cases are being prepared for filing;

(8) If a settlement is not reached, my clients plan on letting the other employees at other plants owned by your company know that if they are victims of race discrimination, they can speak up or file discrimination charges—and Procter & Gamble will lose in court if it tries to retaliate against them;

(9) If a settlement is not reached, I plan to contact some local union organizers and send them out to the Oglethorpe plant (my understanding is that many of the white employees at Flint River are as upset as the black employees over the pay and progression system);

(10) If only one person out of ten in America (roughly equal to the black population of this country) bought Procter & Gamble's competitors' products on only one trip to the grocery store (say $4.00 worth), the gross sales of Procter & Gamble would be reduced by about $100,000,000.00. I know for a company grossing over $19 billion per year that that is not much. But it would be a nice statement against buying products from a company which will pay hundreds of thousands of dollars and fight for years for its opportunity to practice racial discrimination in its plants.

On January 3, 1989, McHenry responded to the letter and sent copies of both his response and Finkelstein's letter to Judge Fitzpatrick. Judge Fitzpatrick transmitted a copy of the letter to Chief District Judge Wilber Owens on January 5, 1989. Judge Owens issued an order requiring Finkelstein to appear and show cause why he should not be disbarred because of apparent unprofessional conduct as exemplified by the December 24, 1988, letter.

A hearing was held on February 2, 1989, wherein Finkelstein testified that the letter was purely an attempt to negotiate a settlement and that it was not intended to be a threat. He further stated that he probably would not express his views in a similar fashion if he had the opportunity to rewrite the letter. The court noted, however, that Finkelstein stopped short of expressing regret for the letter or its tone. On February 9, 1989, the district court ordered Finkelstein suspended from the practice of law in the federal courts in the Middle District of Georgia for a period of six months.[3]

Several aspects of the letter were found to be troubling to the court. Initially, the court questioned the propriety of Finkelstein "leapfrogging" defendant's trial counsel and found that his direct communication with McHenry was improper in light of the attendant circumstances. The court further found that Finkelstein had mischaracterized the issue of attorney's fees by asking for amounts to which he was not entitled. The court next examined each of the suggested reasons for settlement and found that they could only be read as threats which were an attempt to remove the resolution of disputes from the constitutionally established courts of the United States.

Finkelstein's subsequent motion to vacate the suspension order was denied. The court stated that federal courts may discipline members of the bar whose conduct transgresses a "code" by which an attorney practices which transcends any written code of professional conduct. Finkelstein appeals the court's order of suspension.

## DISCUSSION

When considering a district court's order disqualifying counsel, it is clear that this court applies the "clearly erroneous" test to findings of fact while carefully examining the district court's in-

---

**3.** In order to avoid any prejudice to Finkelstein's clients in the underlying discrimination suits, the suspension was to become effective at the conclusion of the consolidated cases.

terpretation and application of relevant ethical standards. *Norton v. Tallahassee Memorial Hospital*, 700 F.2d 617, 618–20 (11th Cir.1983). This Court must determine for itself whether the attorneys' conduct was so grievous as to require suspension. *Theard v. United States*, 354 U.S. 278, 282, 77 S.Ct. 1274, 1277, 1 L.Ed.2d 1342 (1957).

 It is axiomatic that federal courts admit and suspend attorneys as an exercise of their inherent power. *In re Snyder*, 472 U.S. 634, 643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985). Because lawyers are officers of the court which granted admission, such courts are necessarily vested with the authority, within certain limits, to impose reasonable sanctions for lawyer misconduct. *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir.1985). The state codes of professional responsibility do not by their own terms apply to sanctions in the federal courts and any standards imposed are a matter of federal law. *In re Snyder*, 472 U.S. at 645 n. 6, 105 S.Ct. at 2880 n. 6. The sanctioning court must, however, hold attorneys accountable to recognized standards of professional conduct.

 In examining the district court's order of suspension, the relevant inquiry is whether the attorney can be deemed to have been on notice that the courts would condemn the conduct for which he was sanctioned. *In re Ruffalo*, 390 U.S. 544, 554, 88 S.Ct. 1222, 1228, 20 L.Ed.2d 117 (1968) (White, J., Concurring). This would necessarily include behavior which responsible attorneys would recognize as improper for a member of the profession. *Id.* at 555, 88 S.Ct. at 1228. It cannot be said that the behavior for which Finkelstein was sanctioned falls into this category.[4]

### CONTACT WITH McHENRY

The district court expressed concern with Finkelstein's direct communication with

Procter & Gamble's general counsel, Powell McHenry. Finkelstein corresponded directly with McHenry because there apparently had been a total breakdown in communication between Finkelstein and trial counsel for Procter & Gamble. The record reveals an atmosphere of complete hostility and contempt between the opposing trial lawyers which motivated Finkelstein's direct contact with McHenry.

### REQUEST FOR ATTORNEY'S FEES

 Although not the gravamen of the decision to suspend, the district court found that Finkelstein had misrepresented the issue of attorney's fees by claiming sums to which he was not entitled. Finkelstein may very well have been presumptive in stating the amounts which he believed he was to receive. It is solely within the discretion of the court to determine the amount of attorney's fees, if any, to be awarded to a prevailing party in a civil rights action. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). There is, however, no bar in attempting to negotiate a settlement of attorney's fees along with the plaintiff's substantive claims in such a case. See *Evans v. Jeff D.*, 475 U.S. 717, 731–34, 106 S.Ct. 1531, 1538–41, 89 L.Ed.2d 747 (1986); *Marek v. Chesny*, 473 U.S. 1, 7–8, 105 S.Ct. 3012, 3015, 87 L.Ed.2d 1 (1985). Nevertheless, a decision to suspend a lawyer for presumptive statements as to the amounts of damages and costs sought while negotiating a settlement is unprecedented.

### SUGGESTED REASONS FOR SETTLEMENT

In order to satisfy traditional notions of due process, the conduct prohibited must be ascertainable. *NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 337–38, 9 L.Ed.2d 405 (1963). Specific guidance is

---

**4.** We share the disapproval of the district court caused by Finkelstein's letter to McHenry. It not only "exhibited an unlawyerlike rudeness" but it also displayed a gross misunderstanding of true professionalism. We empathize with the court's astonishment that his suggestion of settlement negotiations led to a letter in language insulting his adversary, thus foreclosing any possibility of meaningful negotiations. However, under the teaching of *In re Snyder*, 472 U.S. 634, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985), his conduct and expressions did not warrant his suspension from practice.

provided by case law, applicable court rules, and the "lore of the profession" as embodied in the codes of professional conduct. *In re Snyder*, 472 U.S. at 645, 105 S.Ct. at 2881. The court disclaimed reliance upon a written canon of ethics, a code provision, or a case which proscribed the conduct which it found reprehensible but depended entirely upon a "code by which an attorney practices which transcends any written code of professional conduct." The fatal flaw with this transcendental code of conduct is that it existed only in the subjective opinion of the court, of which appellant had no notice, and was the sole basis of the sanction administered *after* the conduct had occurred.

According to the court, Finkelstein improperly injected the judicial process with pressure group politics, an act amounting to "conduct unbecoming a member of the bar." Such behavior has been defined by the United States Supreme Court as "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts or conduct inimical to the administration of justice." *In re Snyder*, 472 U.S. at 645, 105 S.Ct. at 2881. In *Snyder*, the United States Court of Appeals for the Eighth Circuit sanctioned a lawyer when he wrote a harsh letter criticizing the appellate court's administration of the Criminal Justice Act. The Court of Appeals suspended the attorney for six months based on his "refusal to show continuing respect for the court," and his disrespectful statements rendering him "not presently fit to practice law in the federal courts." The United States Supreme Court reversed the court of appeals' order of suspension, stating:

> [E]ven assuming that the letter exhibited an unlawyerlike rudeness, a single incident of rudeness or lack of professional courtesy ... does not support a finding of contumacious conduct, or a finding that a lawyer is 'not presently fit to practice law in the federal courts.' Nor does it rise to the level of 'conduct unbecoming a member of the bar' warranting suspension from practice.

**5.** The affiants testified that in their opinions they could find no ethical violations or unpro-

472 U.S. at 647, 105 S.Ct. at 2881, 86 L.Ed.2d at 514.

CONCLUSION

Finkelstein was suspended for writing a letter to opposing counsel which the district court considered threatening and disruptive to the judicial process. On the other hand, responsible attorneys may find no impropriety in Finkelstein's conduct, as is evidenced by the affidavits of four licensed attorneys of the State of Georgia filed in response to the court's show cause order.[5] While the conduct of appellant may have been an act of "unlawyerlike rudeness" and offensive to the district court, he was not on notice that such conduct would lead to his suspension from the practice of law. This Court will "not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct." *In re Ruffalo*, 390 U.S. 544, 556, 88 S.Ct. 1222, 1229, 20 L.Ed.2d 117 (1968) (White, J., Concurring). Accordingly, we reverse and remand with direction to vacate the order of suspension.

REVERSED and REMANDED.

fessional conduct within the letter.