United States Court of Appeals,

Eleventh Circuit.

No. 95-6138.

SCHLUMBERGER TECHNOLOGIES, INC., a Delaware corporation, Plaintiff-Counterclaim-Defendant-Appellant,

v.

G. Dan WILEY;  Robert A. Fergusson;  Donald Bahouth, Defendants-Counterclaim-Plaintiffs-Appellees.

June 5, 1997.

Appeal from the United States District Court for the Southern District of Alabama. (No. 94-0118-AH-M), Alex T. Howard, Jr., Judge.

Before BIRCH and CARNES, Circuit Judges, and MICHAEL[*], Senior District Judge.

BIRCH, Circuit Judge:

The issue in this appeal is the standard that governs a district court's decision to deny a party's motion on behalf of a non-resident attorney for admission *pro hac vice.* The district court denied admission *pro hac vice* to plaintiff's counsel, even though it did not find that the attorney had violated any specific ethical rules. We hold that binding circuit precedent requires a showing of unethical conduct of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the district court in order to justify the denial of an applicant's *pro hac vice* admission. Accordingly, we vacate the district court's order denying counsel's admission *pro hac vice* and remand for further proceedings.

I. BACKGROUND

This interlocutory appeal of the district order's denying admission *pro hac vice* to Roger M. Witten, counsel for Schlumberger Technologies, Inc. ("Schlumberger"), arises from a lawsuit filed by Schlumberger against former officers and directors of its wholly owned subsidiary, Global Tel*Link Corporation ("Global"). The defendants, G. Dan Wiley, Robert A. Fergusson, and Donald Bahouth, were the most senior officers of Global, and the first two were also directors of Global,

[*]Honorable James H. Michael, Senior U.S. District Judge for the Western District of Virginia, sitting by designation.

until Schlumberger terminated their employment in February 1994 as a result of a legal audit of Global.

On April 1, 1993, Schlumberger acquired Global, which is headquartered in Mobile, Alabama, and whose principal line of business involved the manufacture and sale of communication services, predominantly automated pay telephones for prison systems. In the fall of 1993, Louisiana newspapers reported allegations that Global had overcharged customers in its contract with the Louisiana Department of Corrections, and the Louisiana Public Service Commission started an informal investigation into Global's operations in that state. In October 1993, Schlumberger retained the Washington, D.C. law firm of Wilmer, Cutler & Pickering ("WC & P") to provide advice on communications law issues. In December 1993, Schlumberger further retained WC & P to assist in a legal audit of Global and selected Witten, a WC & P partner, to lead the audit team. The audit team included other WC & P lawyers, lawyers from the Mobile, Alabama law firm of Helmsing, Lyons, Sims & Leach, and accountants from Price Waterhouse ("PW"). The legal audit began on January 10, 1994 and continued for approximately one month. At an initial informational meeting on the first day of the audit, Witten explained to Global middle and upper management personnel the process of the legal audit and told them that they would be interviewed by the audit team. Witten stated that the WC & P lawyers involved in the audit represented Schlumberger and were not lawyers for any of Global's employees or management. Dale Gaudier, in-house counsel for Schlumberger, distributed to Global employees a memorandum ("the Gaudier memo") dated January 10, 1994, stating in relevant part:

> Schlumberger considers this review, and the information it and PW and WC & P gather during the review, to be *confidential.* You should not discuss or disclose to those outside Global the fact that a review is taking place or the nature of the review. You should also not discuss the substance of any conversations you may have with PW, WC & P or Schlumberger legal personnel with anyone inside or outside Global.

R3-Def. Exh. 1.

The audit team then secured Global's premises as well as its documents and computer files, and started interviewing Global employees. At the start of each interview, including those with Bahouth and Fergusson, Witten explained again that he represented Schlumberger, that he did not

represent the interviewee personally, and that he could not guarantee that Schlumberger would not disclose any statements made by the interviewee.[1] Witten and other members of the audit team interviewed Bahouth and Fergusson last, on January 17 to 18 and on January 18, respectively. As a result of the audit, Schlumberger concluded that Global had engaged in extensive consumer fraud and other unlawful practices while under defendants' management. Schlumberger voluntarily disclosed its findings to the appropriate state law enforcement and regulatory authorities and undertook to make restitution to the defrauded consumers. Schlumberger also fired the defendants for cause and commenced this suit in federal district court, alleging fraud under federal securities laws and Alabama law. Witten and local counsel signed the complaint.

Fergusson filed a motion, later joined by Wiley and Bahouth, to deny admission *pro hac vice* to Witten, alleging that Witten acted unethically during the interview with Fergusson.[2] In an affidavit attached to his motion, Fergusson stated that, based on his observation of the audit team during the period preceding his interview and conversations with Global employees who had been interviewed, he had reason to suspect that he and others might be the targets of the investigation. Fergusson also claimed that he asked at the outset of the interview whether he should have a lawyer present and that Witten assured him that he need not. Bahouth later filed an affidavit making similar allegations.

In Schlumberger's opposition to Fergusson's motion to bar Witten's admission, Schlumberger denied that Fergusson asked whether he should have a lawyer at any time during his interview and asserted that none of the three members of the audit team who participated in the interview advised Fergusson in any way on whether he should have a personal lawyer. Schlumberger stated that, during the interview, Fergusson said that he might want to consult a lawyer in the future in his

[1]This assertion, which Witten and other interviewers made in their affidavits, is not disputed by the defendants. What happened later in the interview is disputed, as will become apparent subsequently in this opinion.

[2]Fergusson alleged that Witten violated rules 4.2 ("communication with Person Represented by Counsel"), 4.3 ("Dealing with Unrepresented Person"), 4.4 ("Respect for Rights of Third Persons") of the Alabama Rules of Professional Conduct ("ARPC") made applicable to attorneys admitted *pro hac vice* in the Southern District of Alabama by Local Rule 1(A)(4). The defendants later added ARPC Rule 3.7 ("Lawyer as a Witness") to that list.

capacity as a shareholder's representative. According to Schlumberger, Witten did not give Fergusson any advice as to that matter and his only response was that Fergusson was being interviewed solely in his capacity as an officer and employee of Global.[3]

The district court held an evidentiary hearing on June 2, 1994. Both Witten and Fergusson testified, essentially repeating the claims in their respective affidavits. During Fergusson's direct examination, however, the district court interrupted the examination and asked Fergusson whether the Gaudier memo was ever modified during the course of the audit. When Fergusson answered in the negative, the court opined that the statement, "You should also not discuss the substance of any conversations you may have with PW, WC & P or Schlumberger legal personnel with anyone inside or outside Global," contained in the Gaudier memo meant that Global employees were precluded from talking to a lawyer regarding the audit.[4] R3-56.

The district court denied Witten's admission *pro hac vice* at the end of the hearing. The court did not make any formal findings of facts and conclusions of law at that time, but gave the following reasons, which we construe as the court's findings of fact: (1) the purpose of the legal audit team investigation was to "get some dirt on [the defendants] before they got lawyers"; (2) Fergusson

---

[3]With respect to Bahouth, Schlumberger later submitted affidavits from several audit team members, including Witten, stating that Bahouth never asked whether he should have a lawyer at his interview and that no member of the audit team ever advised Bahouth about this issue. Moreover, the affiants asserted—and Bahouth never denied—that Witten and two colleagues informed Bahouth on January 14, 1994, that the audit to that date had revealed questionable practices by Global and that Schlumberger was considering to suspend Bahouth with pay. Bahouth reportedly responded that he knew what the questionable practices were and requested that Schlumberger postpone its decision until it heard his "side of the story."

[4]Before the district court made these comments, none of the defendants had ever claimed that they had interpreted the Gaudier memo as precluding them from consulting a personal lawyer about the audit. Schlumberger maintains that the purpose of the Gaudier memo was to preserve the corporate attorney-client privilege, in conformance with *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Indeed, the language of the Gaudier memo is quite similar to the language of the letter before the Supreme Court in *Upjohn.* Moreover, it later became clear that Fergusson, at least, did not interpret the Gaudier memo to preclude any contact with a lawyer. Although Fergusson testified at the hearing that he never told any lawyer about the audit, he eventually admitted that he did contact a lawyer during the period of the audit and that he told the lawyer about the audit. Fergusson made this admission after being confronted with telephone logs showing that he called a law firm in Palo Alto, California during the period of the audit, and stated that he contacted the lawyer in his capacity as a shareholders' representative. *See* Supp. R1-142, 144, & 159.

claims that he asked for a lawyer and even Witten does not deny that the subject of a lawyer was brought up; and (3) the language of Gaudier memo, coupled with the fact that the subject of lawyer was brought up in Fergusson's interview, would be taken by any layman as precluding him from consulting with a personal lawyer. R3-114 & 115. The court concluded: "So I feel that [Mr.] Witten ... [was] acting in a fashion which this Court terms to be unethical. And therefore, since this Court terms it to be unethical, the Court will not admit [him] to practice pro hac vice in this case." R3-115.

Schlumberger filed a motion for reconsideration, supported by declarations of former Fifth Circuit Judge and Attorney General Griffin B. Bell, former Eighth Circuit Judge and Director of the Central Intelligence Agency William H. Webster, and Yale Law Professor Geoffrey C. Hazard. The three declarants supported Schlumberger's contention that Witten did not violate any rules of ethical conduct in not affirmatively advising the defendants to retain personal counsel and that the Gaudier memo was a standard memorandum routinely used in similar circumstances to preserve the corporate attorney-client privilege in accordance with *Upjohn.* The declarants asserted that, in their experience, the Gaudier memo comported with prevalent practice and that they have never had any experience with anyone interpreting such a memorandum to preclude consultation with a personal attorney.

The district court issued a written order in which it denied Schlumberger's motion to reconsider the court's denial of admission *pro hac vice* to Witten. The court did not make any new findings of fact in its order. It held, however, that denying Witten's admission based on these facts was within its discretion. The court also struck the declarations of Bell, Webster, and Hazard because it interpreted them as disputing the district court's factual finding that the effect of the Gaudier memo on the defendants was to preclude them from consulting legal counsel. Thus, the court concluded that these affidavits did not aid the court because it was "completely capable of handling on its own" this factual issue. *Id.* at 16-17.

The district court certified an appeal to this court pursuant to 28 U.S.C. § 1292(b) on the

portion of its order denying admission *pro hac vice* of Witten.[5] The court declined to certify the

portion of its order striking the declarations of Bell, Webster, and Hazard.[6]

## II. DISCUSSION

A. *Standard of Review*

The district court's determination of the appropriate legal standard that governs this case and

its interpretation of that standard is subject to *de novo* review. *See United States v. Mendoza-*

*Cecelia,* 963 F.2d 1467, 1471 (11th Cir.1992). Within the framework of the legal standard

governing the court's decision to deny *pro hac vice* admission, the parties disagree as to the standard

of review applicable to the court's determinations. In cases involving attorney disqualifications, we

have used two apparently inconsistent standards of review. *See generally Norton v. Tallahassee*

*Mem'l Hosp.,* 700 F.2d 617, 618-20 (11th Cir.1983) ("*Norton II* ") ("[C]ourts have not always been

careful to enunciate their reasons for exercising one type of review ...—traditional review of factual

findings and legal conclusions or review of abuse of discretion...."). In *Norton II,* we held that the

district court's factual determinations are reviewed under the clearly erroneous standard, but that the

court's "appl[ication of] the standards of the Code of Professional Responsibility to questions of

attorney disqualification warrant full appellate review to ensure that there is consistency of

treatment." *Id*. at 619-20. On other occasions, we have reviewed a district court's decision to revoke

---

[5]Schlumberger attached to its motion for certification pursuant to § 1292(b) a letter from the District of Columbia bar to Witten which contained the results of an investigation by the D.C. bar of Witten's conduct. The letter from the D.C. bar does not purport to resolve the factual dispute about whether Witten personally assured Fergusson and Bahouth that they did not need a lawyer present while Witten interviewed them. In any event, it is the province of the district court to resolve that and any other factual disputes.

However, based on information provided by Witten and a review of the transcript of testimony at the June 2, 1994 hearing, the D.C. bar concluded that Witten did not violate any D.C. Rules of Professional Conduct (which are virtually identical to Alabama's rules as well as the ABA Model Rules of Professional Conduct). The district court denied the defendants' motion to strike that letter.

[6]The court correctly recognized, however, that its refusal to certify the portion of its order striking the declarations does not place that portion of the order beyond our jurisdiction under § 1292(b). "When a district court certifies an order for appeal, all questions material to that particular order are properly before the court of appeals." *United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1554 n. 2 (11th Cir.1990); *accord Yamaha Motor Corp., U.S.A. v. Calhoun,* --- U.S. ----, ----, 116 S.Ct. 619, 623, 133 L.Ed.2d 578 (1996).

an attorney's admission *pro hac vice* for an abuse of discretion. *See United States v. Dinitz,* 538 F.2d 1214, 1219 (5th Cir.1976) (en banc); *Nationalist Movement v. City of Cumming,* 913 F.2d 885, 895 (11th Cir.1990), *aff'd sub nom. on other grounds, Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

This apparent inconsistency disappears, however, when we consider the particular circumstances and timing of the court's disqualification of an attorney in these cases. Indeed, we explained in *Norton II* that these circumstances dictate the extent of the district court's discretion and, therefore, the scope of our review. We explained that, in a case like *Dinitz,* the abuse of discretion standard is applicable because "that particular disqualification decision [was] so closely linked to the trial judge's responsibility to supervise the conduct of the case before him." *Norton II,* 700 F.2d at 619. We stressed that, in *Dinitz,* "the trial court's ... judgment was based on conduct *he had observed.*" *Id.* Similarly, in *Nationalist Movement,* the district court revoked an attorney's *pro hac vice* admission after that attorney persisted, during the trial, in a course of conduct that can only be described as "an effort to commit a fraud on the court." *Nationalist Movement,* 913 F.2d at 895. The deference that we accorded the trial judges in both *Dinitz* and *Nationalist Movement* was necessary so that the trial judge could maintain effective control over his or her court room and process. *Id.* at 895 ("[T]his case presents unique facts involving the integrity of the court system and respect for its participants within a courtroom proceeding."). In contrast, the district court's disqualification decision in *Norton II* turned on the proper application of the Rules of Professional Conduct, not on the court's response to an attorney's in-court disruptive behavior. *See Norton v. Tallahassee Mem'l Hosp.,* 689 F.2d 938, 941-42 (11th Cir.1982) ("*Norton I* ") (reversing the district court's disqualification order based on a violation of Canon 9 of the Florida Rules of Professional Conduct), *reh'g denied, Norton II,* 700 F.2d at 620. In reviewing a district court's interpretation and application of the Rules of Professional Conduct, which involve a mixed question of law and fact, we do not defer to the district court's determinations. *See Norton II,* 700 F.2d at 620; *In re Finkelstein,* 901 F.2d 1560, 1563-64 (11th Cir.1990).

Even though Witten's conduct is related to the case at bar, that conduct occurred before the

action was ever filed, did not occur in front of the district court, and was not of a type to disrupt the proceedings before the court. Moreover, as we shall explain below, the court's decision to deny Witten's admission turns on its application of the relevant Rules of Professional Conduct. Therefore, in accordance with *Norton II,* we review the district court's factual finding for clear error and its application of the Rules to the facts *de novo.*

B. *Analysis*

In denying Witten admission, the district court interpreted our decision in *In re Evans,* 524 F.2d 1004 (5th Cir.1975), to govern only the procedural requirements for denying admission *pro hac vice* to an attorney. The court held that, once a complaint alleging misconduct rising to the level of disbarment is made, the district court has broad discretion to deny admission *pro hac vice* after notice and a hearing, without necessarily finding that the misconduct actually rose to a level justifying disbarment. For this proposition, the district court cited *Dinitz,* 538 F.2d at 1219, *Kleiner v. First National Bank,* 751 F.2d 1193, 1209 (11th Cir.1985), and *Nationalist Movement,* 913 F.2d at 895. Thus, although "[t]he [c]ourt did not find that Witten violated any specific ethical rules, as would be required for disbarment," it denied Witten's admission because the "[d]efendants here submitted "evidence of behavior that [the court] believe[d] justifie[d] denying an attorney admission *pro hac vice.*' " R2-177-14 (alterations in original) (quoting *Evans,* 524 F.2d at 1008).

In *Evans,* we enunciated both a procedural standard and a substantive standard for a district court's decision to deny admission *pro hac vice* to an attorney. First, "[i]f a District Court has evidence of behavior that it believes justifies denying an attorney admission *pro hac vice,*" it must give the attorney adequate notice of the ethical charges and set a hearing on the issue. *Evans,* 524 F.2d at 1008. The district court believed in this case that the evidence against Witten rose to the threshold set in *Evans* for a hearing. The court mistakenly believed, however, that it had the authority to deny an attorney admission *pro hac vice* because it believed the evidence justified such action, without any further findings. This was error, because the district court disregarded the substantive standard set out in *Evans:*

> Admission to a state bar creates a presumption of good moral character that cannot be overcome merely by the whims of the District Court. An applicant for admission *pro hac*

*vice* who is a member in good standing of a state bar may not be denied the privilege to appear except "on a showing that in any legal matter, whether before the particular district court or in another jurisdiction, he has been guilty of unethical conduct of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the court."

*Evans,* 524 F.2d at 1007 (quoting *Sanders v. Russell,* 401 F.2d 241, 247-48 (5th Cir.1968)). The district court specifically disclaimed in its order a finding of disbarable conduct on Witten's part, as is required under *Evans.* Therefore, its decision to deny Witten admission *pro hac vice* was error.

The district court's reliance on post-*Evans* cases giving district courts wider latitude to revoke an attorney's admission *pro hac vice* is misplaced. In a footnote, the district court cited *Kirkland v. National Mortgage Network, Inc.,* 884 F.2d 1367 (11th Cir.1989), for the proposition that "the Supreme Court's decision in *Leis v. Flynt,* 439 U.S. 438, 443-45, [99 S.Ct. 698, 701-02, 58 L.Ed.2d 717] (1979), may have partly undermined *Evans* insofar as the Supreme Court made clear that "no Fourteenth Amendment property interest is implicated by a state court's refusal to *admit* an attorney *pro hac vice.*' " R2-177-12 n. 16 (quoting *Kirkland,* 884 F.2d at 1371). In *Kirkland,* the district court revoked an attorney's admission *pro hac vice* without giving him notice of the charges against him or affording him a hearing. We reversed the district court's decision because it failed to comply with the procedural requirement of *Evans. Id.* at 1372. Therefore, the *Kirkland* court's statement casting doubt on the continued vitality of *Evans* 's substantive standard is pure dictum, which is not binding on us. Indeed, it is not clear why a decision holding that a federal court cannot review a *state court* 's denial of admission *pro hac vice* because that denial does not implicate a Fourteenth Amendment property interest would have any bearing on our decision in *Evans.* In *Evans,* we did not rest our decision on any purported constitutional right for an attorney to be admitted *pro hac vice* in a federal court. We, instead, exercised our supervisory authority over the district courts in this circuit to circumscribe the discretion of trial judges in deciding whether to admit an attorney *pro hac vice.* For this reason, we rejected the Fourth Circuit's standard which gives district courts the discretion "to deny admission *pro hac vice* to an attorney guilty of "unlawyerlike conduct' " because we found "the discretion permitted by the Fourth Circuit too broad and, consequently, susceptible to abuse." *Evans,* 524 F.2d at 1007 n. 1 (citing *Thomas v. Cassidy,* 249 F.2d 91 (4th Cir.1957)). We conclude that, contrary to the dictum in *Kirkland,* the Supreme

Court's decision in *Leis* did not cast doubt on *Evans'* holding. *Evans,* therefore, remains binding precedent in this circuit.

Nonetheless, the defendants suggest that Eleventh Circuit precedent on the issue of attorney disqualification has evolved into two different lines of decision, one exemplified by *Evans* and the other by *Dinitz* and *Nationalist Movement,* and that the district court correctly relied on the latter to deny Witten's admission. We disagree. First, we distinguished *Evans* in *Dinitz* because

> *Evans* merely attempted to establish standards applicable to a pretrial motion to appear *pro hac vice ....* Once an attorney has been admitted *pro hac vice* and a case has proceeded to trial, however, the considerations are quite different. The interests of justice demand that a judge have a measure of discretion to take steps necessary to ensure that order is maintained.

*Dinitz,* 538 F.2d at 1223-24. Therefore, as *Dinitz* itself teaches, *Evans* controls here because this case involves a pre-trial motion for admission *pro hac vice.*

Second, a more complete review of Eleventh Circuit precedent on the issue of attorney disqualification shows that the district court's reading of that case law is erroneous. As we explained in our discussion of the standard of review applicable to this case, there are two distinct lines of Eleventh Circuit decisions on attorney disqualification, but these two lines can be reconciled if we consider the particular circumstances of each case. In *Dinitz* and *Nationalist Movement,* we were faced with "unique facts involving the integrity of the court system and respect for its participants within a courtroom proceeding." *Nationalist Movement,* 913 F.2d at 895. In both *Dinitz* and *Nationalist Movement,* the district court revoked an attorney's admission *pro hac vice* after repeated warnings due to the attorney's persistence in ethically questionable conduct that occurred in the courtroom, in the view of the district court, and that resulted in a disruption of the proceedings. *See Nationalist Movement,* 913 F.2d at 893 (Attorney actions included: "presenting ... a witness to authenticate corporate documents ... [in] an attempt to create fraud on the court; making frivolous objections ... to prevent the truth from emerging about [the witness's] lack of qualifications to testify; concealing from the court his personal interest in the litigation ...; and asking an adverse witness whether he was a veteran, in an effort to embarrass and disparage him."); *Dinitz,* 538 F.2d at 1220-21 & nn. 8-10 ("The disruptive effect of [the attorney']s conduct is evident when we consider that

the court was forced to delay the beginning of the trial to hear testimony on a suppression motion that was utterly frivolous, to warn the attorney repeatedly about specific instances of misconduct, and to send the jury out of the courtroom no less than three times during the course of his opening statement."). The circumstances of this case clearly do not involve such "unique facts."[7]

By contrast, in cases where the district court's decision to disqualify an attorney was based on an alleged ethical violation, we carefully reviewed the court's interpretation and application of the Rules of Professional Conduct. *See Norton I,* 689 F.2d at 941-42 (reversing the district court's disqualification order based on a violation of Canon 9 of the Florida Rules of Professional Conduct). In a more recent case, we reversed a district court's decision disqualifying an attorney for conduct which, according to the district court, was so reprehensible as to "transgress[ ] a "code' by which an attorney practices which transcends any written code of professional conduct." *Finkelstein,* 901 F.2d at 1563. *Finkelstein* involved the following circumstances: In the interim period between the liability phase and the damages phase of a lengthy civil rights trial, and after the district court had encouraged the parties to negotiate a settlement, the attorney "leapfrogged" defendant's trial attorney and sent a settlement letter directly to defendant's corporate counsel. The tone of the letter was inappropriately threatening. *See id.* at 1562-63. The district court understandably found such conduct reprehensible and disqualified the responsible attorney on that basis. Upon review, "[w]e share[d] the disapproval of the district court caused by Finkelstein's letter to [corporate counsel]. It not only "exhibited an unlawyerlike rudeness' but it also displayed a gross misunderstanding of true professionalism." *Id.* at 1564 n. 4. Nonetheless, we reversed because the district court may not

---

[7]The district court's and defendants' reliance on *Kleiner,* 751 F.2d 1193, is also misplaced. *Kleiner,* like *Dinitz* and *Nationalist Movement,* involved the disqualification of an attorney from the case before the court for conduct related to the proceedings. In fact, the attorney disqualified in *Kleiner* was a local attorney, regularly admitted to practice before the district court. It is true that the conduct at issue in *Kleiner* did not occur in front of the district court. We affirmed the district court's disqualification in that case, however, because it was a sanction for the attorney deliberately advising his client to disobey the court's protective order not to contact any members the plaintiff class. *See id.* at 1207. We stressed that disqualification was justified by the "strong ... interest in securing obedience to mandates of the court which is necessary to secure the orderly administration of the laws." *Id.* at 1210. The conduct of which Witten is accused in no way threatens the orderly administration of the laws. Indeed, this conduct occurred before the instant action was ever filed and, thus, could not be viewed as a challenge to the district court's authority in any way.

disqualify an attorney on the basis of some "transcendental code of conduct ... that ... existed only in the subjective opinion of the court, of which [the attorney] had no notice, and [that] was the sole basis of the sanction administered *after* the conduct had occurred." *Id.* at 1565. Thus, where the district court's disqualification order is based on an allegation of ethical violation, the court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power. The court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule—a legal conclusion subject to full appellate review—for its order to be upheld. *See Norton I,* 689 F.2d at 941. Moreover, as we stated in *Finkelstein,* "[t]his Court will "not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct.' " *Finkelstein,* 901 F.2d at 1565 (quoting *In re Ruffalo,* 390 U.S. 544, 556, 88 S.Ct. 1222, 1229, 20 L.Ed.2d 117 (1968) (White, J., concurring)).

In sum, our circuit's law governing district courts decisions to deny a motion for admission *pro hac vice* or to disqualify an attorney already admitted to appear before the court is not inconsistent. It is sensibly tailored to circumscribe the discretion of trial judges to suit the particular circumstances of a given case. The standards governing a district court's denial of a pre-trial motion for admission *pro hac vice* are set out in *Evans:* Absent a showing of unethical conduct rising to a level that would justify disbarment, the court *must* admit the attorney. *Evans,* 524 F.2d at 1007. The standards governing disqualification of an attorney already admitted to appear before the district court differ, depending on the circumstances. If the conduct at issue threatens disruption of the court proceedings, *see, e.g., Dinitz,* 538 F.2d at 1221 (in-court misconduct) and *Nationalist Movement,* 913 F.2d at 893 (same), or is a deliberate challenge to the authority of the district court, *see, e.g., Kleiner,* 751 F.2d at 1207 (attorney deliberately advising client to disobey the district court's protective order), we give great deference to a trial court's decision to disqualify the responsible attorney. If, however, the conduct at issue does not threaten the orderly administration of justice but is allegedly unethical, we insist that district courts rest their disqualification decisions on the

violation of specific Rules of Professional Conduct, not on some "transcendental code of conduct ... that ... exist[s] only in the subjective opinion of the court." *Finkelstein,* 901 F.2d at 1565.[8]

Based on our review of the governing case law, we conclude that the district court incorrectly construed the scope of its discretion. Because this case involves a pre-trial motion for admission *pro hac vice,* it is controlled by the standard enunciated in *Evans.* The district court's order denying Witten admission *pro hac vice* is vacated because "[t]he court did not find that Witten violated any specific ethical rules, as would be required for disbarment." R2-177-14.[9]

The district court in this case was mindful that "[a]ccusations of unethical conduct are among the most serious of allegations that [a c]ourt must consider ... [and] aware that an attorney's honor as an officer of the [c]ourt is at issue here." R-2-177-15 (internal quotation marks omitted). We share the district's court sense of gravity over this issue, because "the "brand of disqualification'

---

[8]The defendants contend that if we were to reverse the trial court's decision, we would be condoning "hard ball" discovery and investigation techniques. This contention, it appears to us, invites us to sanction Witten for conduct that does not necessarily violate the Rules of Professional Conduct applicable to the Southern District of Alabama bar, but on the basis of a "transcendental code of ethical conduct." Whatever we may personally think of "hard ball" litigation tactics—and we do not mean to intimate in any way that we consider Witten's conduct to fall within this category of tactics—it is not up to us or the district court to impose our own views of what tactics are or are not acceptable through the use of after-the-fact disqualification. We therefore decline the defendants' invitation for such a finding. It should be noted that district courts remain vested with the discretion to control the litigation before them and to curb the use of abusive litigation techniques *during the pendency of the litigation* through protective orders and other appropriate means at their disposal.

[9]Despite this language in the district court's order, the defendants assert that the court did find that Witten violated Rules 4.2, 4.3, and 4.4 of the ARPC. Rather, according to the defendants, the district court did not find it necessary to expend further resources to decide whether Witten's violation was so egregious as to justify disbarment. We do not share the defendants' interpretation of the district court's order. First, the court's order is quite carefully constructed and expressly relies on *Dinitz* and *Nationalist Movement,* which do not require the court to find a specific ethical violation before taking disciplinary action against an attorney. Second, although the court characterized its decision at the June 2, 1994 hearing as having found "that Witten acted in an unethical fashion," R2-177-15, it never specified any Rule of Professional Conduct that Witten had violated. Indeed, a review of the transcript of the hearing suggests that the court relied on a personal "transcendental code of conduct" rather than the Alabama or Model Rules made applicable to the instant proceedings through Local Rule 1(A)(4). *See* R3-115 ("So I feel that ... Witten ... [was] acting in a fashion which *this Court terms to be unethical.* And therefore, since *this Court terms it to be unethical,* the Court will not admit ... [Witten] to practice pro hac vice in this case.") (emphasis added). Under *Finkelstein,* the district court may not discipline an attorney—let alone find that his conduct rose to the level of disbarment—on the basis that he violated a "transcendental code of conduct," of which he had no notice. *Finkelstein,* 901 F.2d at 1565.

on grounds of dishonesty and bad faith could well hang over [an attorney's] name and career for years to come." *Kirkland,* 884 F.2d at 1370 (holding that a district court's order disqualifying an attorney is reviewable by this court even after the underlying case has settled because of the gravity of the accusations of unethical conduct); *Kleiner,* 751 F.2d at 1200 n. 14. These considerations should weigh even more heavily when (and if) the district court rules upon remand on Witten's admission *pro hac vice.* Because *Evans* requires a showing of disbarable conduct in order to justify the denial of Witten's admission, the district court must be further mindful that "the power [to disbar] is one that ought always to be exercised with great caution; and ought never be exercised except in *clear* cases of misconduct, which affect the standing and character of the party as an attorney." *Ex parte Wall,* 107 U.S. 265, 288, 2 S.Ct. 569, 588, 27 L.Ed. 552 (1883) (emphasis added); *cf.* ABA Model Rules for Lawyer Disciplinary Enforcement Rule 18(C) (1993) (providing that charges of misconduct "shall be established by clear and convincing evidence"); Alabama Rules of Disciplinary Procedure Rule 19 (1995) ("Clear and convincing evidence shall be the standard of proof required in all disciplinary proceedings...."). Moreover, the court should " "not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct.' " *Finkelstein,* 901 F.2d at 1565 (quoting *In re Ruffalo,* 390 U.S. at 556, 88 S.Ct. at 1229 (White, J., concurring)).[10]

## III. CONCLUSION

The issue in this appeal is the standard that governs a district court's decision to deny a party's motion on behalf of a non-resident attorney for admission *pro hac vice.* The district court denied admission *pro hac vice* to plaintiff's counsel, even though it did not find that he violated any specific ethical rules. We hold that binding circuit precedent requires a showing of unethical

---

[10]Schlumberger urges us to reverse the district court's order striking the declarations of Bell, Webster, and Hazard as an abuse of discretion in light of *Finkelstein* 's teaching. We need not and do not reach this issue because we vacate the court's order on the basis that it misapprehended the legal standard governing the denial of admission *pro hac vice.* On remand, however, the court should reconsider its decision to strike these declarations, or decide whether to admit similar declarations accounting for any new factual findings of the court, in light of *Finkelstein.*

conduct of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the district court in order to justify the denial of an applicant's *pro hac vice* admission. Accordingly, we VACATE the district court's order denying Witten admission *pro hac vice* and REMAND for further proceedings consistent with this opinion.