Argued and submitted April 11, affirmed November 26, 2008

Tofigh TAHVILI,
aka Tony Tahvili,
an individual;
and TMT Homes of Oregon, Inc.,
an Oregon corporation,
*Plaintiffs-Appellants,*

*v.*

WASHINGTON MUTUAL BANK,
a Washington corporation;
Wilfried Blum,
an individual;
and Mary Tamara Hamm,
an individual,
*Defendants-Respondents.*

WASHINGTON MUTUAL BANK,
a Washington corporation,
*Counterclaim Plaintiff-Respondent,*

*v.*

Tofigh TAHVILI,
aka Tony Tahvili,
an individual;
and TMT Homes of Oregon, Inc.,
an Oregon corporation,
*Counterclaim Defendants-Appellants.*

Multnomah County Circuit Court
0310-11482; A127302 (Control), A128324

197 P3d 541

Ridgway K. Foley, Jr., argued the cause for appellants. With him on the briefs were Greene & Markley, P.C., and Burton V. McCullough, California.

Timothy R. Volpert argued the cause for respondent Washington Mutual Bank. With him on the brief was Davis Wright Tremaine LLP.

No appearance for respondents Wilfried Blum and Mary Tamara Hamm.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiffs Tofigh Tahvili and TMT Homes of Oregon (TMTO) appeal from a judgment in favor of defendants Washington Mutual Bank, Wilfried Blum, and Mary Hamm on plaintiffs' various tort and contract claims.[1] Plaintiffs assert that the trial court erred in dismissing various claims before trial pursuant to ORCP 21, erred in revoking the *pro hac vice* status of one of plaintiffs' attorneys, Burton McCullough, during trial, and ultimately erred in directing a verdict against the remaining claims when plaintiffs' attorney of record, Robert J. Miller, chose not to proceed with the trial due to the court's revocation of McCullough's *pro hac vice* status. We reject without discussion all of plaintiffs' assignments of error except those concerning the revocation of McCullough's *pro hac vice* status and the ensuing directed verdict. For the reasons set forth below, we conclude that the trial court did not err in either regard. Accordingly, we affirm.

The circumstances pertinent to the revocation of McCullough's *pro hac vice* status and the subsequent allowance of the directed verdict motion are essentially procedural, and we describe the substantive issues in the case only to the extent necessary to place, in fair context, the nature and dynamics of McCullough's conduct that resulted in the court's revocation order. The parties to this case, as well as some other parties, including several Washington corporations in which plaintiff Tahvili was involved, were parties to prior litigation (the Washington County litigation) that culminated in a mediated agreement. Under that agreement, the parties, in effect, stipulated that the Washington County litigation would be discontinued and that, instead, this action would be commenced in Multnomah County by Tahvili and TMTO against defendants.

Plaintiffs filed this action in Multnomah County Circuit Court in October 2003. At the time the complaint was filed, Miller, who was, and is, a member of the Oregon State

---

[1] Defendant Blum did not appear in this proceeding. Defendant Hamm appeared *pro se*. Washington Mutual is the only defendant who appears on appeal.

Bar, filed a motion to allow McCullough, a California attorney, to appear *pro hac vice* as the lead counsel in the case. That motion was granted.

From the outset, the parties disputed whether plaintiffs' claims in this case exceeded the scope of those contemplated under their prior mediated agreement. The trial court, for the most part, agreed with defendants concerning the limits on the claims that could be litigated in this action.

Plaintiffs requested a jury trial, and trial was scheduled to begin on November 4, 2004. On that date, the trial court considered many motions, including several motions *in limine* and ORCP 21 motions. As particularly pertinent here, the trial court agreed with defendants that, in this action, Tahvili could not recover, as an element of his personal damages, consequential damages purportedly incurred by the Washington corporations with whom Tahvili was associated—that is, the entities that had been plaintiffs in the Washington County litigation but were not parties to this action. Accordingly, the trial court precluded Tahvili from presenting evidence of those entities' damages, including lost profits, purportedly incurred as a result of defendants' tortious conduct and breach of contract.

Later that day, following the court's ruling on the *in limine* motions, McCullough attempted to revisit the matter of the Washington corporations and again told the court that he considered the evidence concerning damages to the Washington corporations to be relevant to Tahvili's claim for damages. The trial court reiterated: "It's not coming in."

A jury was impaneled on November 8, 2004. During *voir dire*, McCullough described the case as involving "tens of millions of dollars." One of Washington Mutual's counsel raised a concern about that statement, noting that it appeared to relate to damages purportedly incurred by the Washington corporations. After the trial court reiterated yet again that damages that Tahvili suffered due to losses of the Washington corporations were not at issue in the present case, McCullough stated that he intended to prove certain losses that Tahvili suffered in Washington that were not directly associated with the Washington corporations. In

reply, Washington Mutual's attorney pointed out that no such losses had been pleaded, and the court agreed.

After further argument, the trial court determined that all of the damages claimed by Tahvili personally were, in actuality, damages pertaining to the nonparty Washington corporations. Because those damages were not recoverable by Tahvili personally, the court concomitantly granted certain of defendants' motions pursuant to ORCP 21 G, which had the effect of removing all of Tahvili's individual claims from the case. In the wake of those rulings, what remained to be tried were plaintiff TMTO's claims against defendants, seeking damages of approximately $3.2 million.

The following day, McCullough again argued to the trial court that plaintiff Tahvili should be allowed to seek damages relating to the Washington corporations at least against defendants Blum and Hamm. The court indicated to McCullough that its ruling about the nonrecoverability of such damages was equally applicable to all defendants. Nevertheless, McCullough continued to argue the point on which the trial court had ruled. The court then stated:

"You raise Washington damages again and Mr. Miller will try the case from now on. The *pro hac vice* certification will be rescinded. There won't be Washington damages claimed in this case."

Later that day, in his opening statement, McCullough referred to the hearsay evidence that the trial court had previously ruled *in limine* would not come into evidence. The court excused the jury, clarified with McCullough that he did not have any nonhearsay source of evidence for the matter to which he had just referred in opening statement, and reiterated that the evidence was not admissible. The trial court then stated: "And I made my rulings, every which one of which regarding Washington and Mr. Tahvili you have ignored. And this is yet another example, and we're just not going to do this." As McCullough continued to argue with the court about various rulings, the court admonished him:

"I've already ruled. And I don't know how to make this clear to you because you don't follow any of my rulings. If

you can't get it in through door number 1[,] you try door number 2 or door number 3. This is not Let's Make a Deal, this is court. And there's something sacred about what we do.

"If you continue to violate the rules and there are objections there will be sanctions. And they'll start with money sanctions. Not going to be a mistrial, because I really think that's what may be attempted to be gotten in light of dissatisfaction."

McCullough then argued that the disputed evidence could be admitted because it was not offered for the truth of the matter asserted. The court disagreed, and added:

"Stop it already. You have rulings you don't like, abide by them. Whether you like them or not doesn't matter. But I will emphasize again, if you do this again, actually, the easiest thing will be Mr. Miller is going to try the case. * * *

"If you continue to thumb your nose at rulings you understand, if you continue, for example, to represent to a jury that which you know you cannot possibly get in except through inadmissible hearsay, Mr. Miller's going to try the case."

The court then asked where Miller was, and McCullough replied that he presumed that Miller was back at his office. When the court asked why, McCullough responded, "He's not needed at this point in the trial." The court replied that Miller was needed "since he is your sponsoring counsel who is supposed to be meaningfully participating. He cannot meaningfully participate in absentia." Consequently, the trial court then ordered that Miller return and "be here for the balance of the trial to be meaningfully participating," because it appeared to the court that it "may well be likely that he will be trying this case."

On the next day, Wednesday, November 10, McCullough elicited testimony from Tahvili that referred to the Washington corporations. The court admonished McCullough not to elicit such testimony, and McCullough made arguments as to why the testimony was relevant. The court stated:

"I've explained my ruling. If you bring in Washington again[,] Mr. Miller will take over. If it is either through Mr. Tahvili's testimony or your questions. I said it yesterday, I meant it yesterday. It is exhausting and unnecessary to go through this again and again and again."

Later that morning, the trial court addressed issues between the parties pertaining to the admission of exhibits. In attempting to avoid continuing and inefficient disputes, the court stated:

"What I can do is require that the parties show one another nonimpeachment only exhibits in advance of each session. Meaning, to make this easier so we aren't wasting time and worrying the jurors to death, which we have this morning, Mr. McCullough, you are directed to give the numbers of the exhibits you will be offering through Mr. Tahvili's testimony this afternoon in advance of reconvening this afternoon."

The court explained that it would rule on the pertinent exhibits at the beginning of each session and that the same procedure would be followed when defendants put on their case. The court concluded:

"So let's just have a new policy that for nonimpeachment only exhibits the party offering them will provide them sufficiently in advance of the reconvening of the session, and then the parties against whom they are offered, if you will, will indicate before we reconvene what exhibits are objectionable, and then we can deal with objections."

Tahvili continued to testify throughout the afternoon of November 10, and McCullough indicated to the court that he expected that Tahvili's direct testimony would continue throughout the next scheduled trial day, which—due to the intervening Veterans Day holiday—would be Monday, November 15. At the end of the November 10 session, McCullough noted that Miller "has been here today pursuant to the court's order. And I believe that it would be appropriate to tell Mr. Miller that he need not appear again unless the court determines that it is necessary." The trial court responded, "[Y]ou've made a representation in your affidavit that Mr. Miller is going to mean[ing]fully participate. To meaningfully participate he's going to have to be here. Cannot meaningfully participate in absentia."

As noted above, the following day, Thursday, was a holiday, and the trial was not scheduled to resume until the following Monday. On Friday, November 12, McCullough sent defense counsel and defendant Hamm a cover letter stating, *"On Monday, November 15, 2004, we will offer into evidence the attached exhibits."* (Emphasis added.) The cover letter referred to documents sufficient to fill 23 three- or four-inch binders. In response to that notice, defense lawyers spent many hours over the weekend reviewing the listed materials.

When court resumed on the following Monday, defense counsel informed the court that a number of the exhibits that McCullough intended to offer pertained to alleged damages incurred by the Washington corporations—that is, they referred to matters that the court had repeatedly, explicitly, ruled were inadmissible. Consequently, defense counsel submitted new motions *in limine* as a result of McCullough's proffer of those materials. McCullough explained that he did not intend to rely on some of the materials in their entirety (*e.g.*, an inch-thick loan file) but, instead, to refer only to a few pages contained within various materials. When the trial court asked McCullough why he had not simply, and precisely, identified those excerpts in his faxed cover letter, the following colloquy ensued:

"MR. MCCULLOUGH: Well, that's what we are going to do. When we gave them the list on Friday we tried to go through all the documents to see which ones potentially would—we would introduce throughout the remainder of the trial so we didn't have to do this on a nightly basis.

"And we were trying to, you know, accommodate them and say, look, these are the ones that we feel we are going to introduce. And as a result we identified, say, the loan file. And then over the weekend we have been going through, quote, the loan file, and identifying the specific pages that we will actually refer to.

"THE COURT: Did you identify, as you were ordered to do, those documents specifically that would be offered through Mr. Tahvili today?

"MR. MCCULLOUGH: We did not identify the specific page numbers on Friday because we didn't have those page

numbers on Friday. But we did identify the documents that we will be referring to today, and I just couldn't do it by Friday.

"THE COURT:    Well, you had to do it by Friday or they're not coming in.

"MR. MCCULLOUGH:    Okay.

"THE COURT:    I made an order that the other side be apprised of what you were offering. Telling them 23 binders for the entire trial doesn't do it in terms of what was going to happen today.

"So do you have a list now of what you are intending to go through with Mr. Tahvili with specificity that was supposed to have been provided Friday?"

In response to the trial court's question, McCullough replied that he had only a partial list, and that he could have a list of the items he intended to use that day "in just a few minutes." The court remarked that "there wasn't compliance with the specific, explicit unambiguous order. And there will have to be before we proceed." The court then clarified with McCullough that the list sent to defense counsel the previous Friday included not only exhibits that he did not intend to introduce through Tahvili on Monday, but also included a number of documents that McCullough did not intend to introduce into evidence at all. McCullough stated that he "thought that would be helpful" to defense counsel.

The following colloquy ensued:

"THE COURT:    Clearly it wasn't because it buried them in minutia with which they didn't have to deal.

"MR. MCCULLOUGH:    No, that's not so. The exhibits that they had, that the list we gave them are the exhibits that we pulled out from all of the exhibits and we said these are the ones we're going to rely upon.

"THE COURT:    That's not what the fax says. It says, we will offer into evidence the attached exhibits, which are all of the exhibits that are to be offered throughout the entire trial.

"And we've already learned that several listed thereon are not being offered at all. And that huge amounts of various of the exhibits that are being offered are not going to be offered through Mr. Tahvili.

"Now, you were ordered to provide the defendants with a listing of those exhibits, not that would be offered throughout the entire trial but would be offered today.

"MR. MCCULLOUGH:   I understand that. We were trying to be helpful, not make more work for them. We thought instead of doing it every night, you know, handing them a list every night for the next day, if we handed them a list for the balance of the trial, we thought that would be helpful to them. We certainly did not try to make more work for them.

"THE COURT:   Surely you did[.]"

The trial court then noted again that defense counsel had been required to work through the weekend to review documents—apparently approximately 30 of them, one of which was contained in five binders—that McCullough did not intend to offer into evidence at all, and continued:

"I was very clear in terms of my order. And that was, provide them with a listing of those exhibits you will be anticipating to offer through Mr. Tahvili.

"That's what you told them on Friday the 12th, it's not what you meant. And you did not comply with the order."

The trial court asked McCullough why he did not "comply with an express, clear, unambiguous court order?" McCullough responded that he was trying "to assist" defendants by providing "a more expansive list so we didn't have to do it every night to them." The court then evaluated the volumes of materials contained in the binders that plaintiff did not intend to offer into evidence, and stated:

"I'm going to do what I said I was going to do, and that's why we have Mr. Miller here.

"For the record, I've never seen such a serial display of refusing to comply with unambiguously clear orders."

After reviewing McCullough's unwillingness to abide by its prior evidentiary rulings, the trial court then rendered the revocation order that is at the core of this appeal:

"I'm astonished at the direct contempt of the order and requiring Ms. Hamm and Washington Mutual to spend scores of hours over documents that are not going to be offered at all or are not going to be offered through Mr. Tahvili.

"*Pro hac vice* permission is revoked, and I will enter an order to that effect.

"Mr. Miller, you are getting to try the balance of the case."

In so ruling, the court explicitly stated that it was finding that there was an "intentional misrepresentation" made by McCullough to defense counsel on Friday, November 12, concerning the documents that plaintiff TMTO intended to introduce into evidence the following Monday.

Both McCullough and Miller indicated to the court that Miller was not prepared to try the case. Miller told the trial court that "at this time [TMTO] is not in a position to proceed with this trial." Miller asked the court "to reset the trial and ask for a continuance and reschedule the trial to allow [TMTO] to obtain counsel." Defendants objected. The trial court, after noting that the case had already been pending for a significant amount of time, denied the request to reschedule the trial. After Miller reiterated that TMTO was unable to proceed, defendants successfully moved for a directed verdict against all remaining claims.

The present appeal ensued. As noted, *see* 224 Or App at 99, we write to address only the trial court's alleged errors in revoking McCullough's *pro hac vice* status, denying plaintiffs' motion to reset the trial, and allowing defendants' subsequent directed verdict motions when Miller refused to proceed. We reject plaintiffs' other assignments of error without discussion.

With respect to revocation of McCullough's *pro hac vice* status, plaintiffs first contend that the trial court "erred as a matter of law and thereby abuse[d] its discretion when it expressly based its revocation on the purported violation of a non-existent order." In an argument replete with insinuations about the trial judge's "mental health and anger issues," references to extra-record matters, and hyperbole,

plaintiffs pronounce that the trial court "**never issued any order prohibiting plaintiff's counsel from notifying defendants of all exhibits he proposed to offer during the remainder of the trial!**" and, thus, the court "**charged Mr. McCullough with violation of a phantom order**[.]" (Boldface in original.)

We pause to express our collective disapproval of such methods of appellate "advocacy." We have repeatedly, in both published opinions and public professional fora, condemned *ad hominem* attacks on trial judges as offensive and improper. Such "scorched-earth" tactics, when coupled—as they almost invariably are—with lurid and misleadingly incomplete descriptions of the record—are counterproductive. They impair, rather than assist, the appellate process.

In all events, plaintiffs' challenge proceeds from a false factual premise: The trial court did *not* revoke McCullough's *pro hac vice* status based on the violation of some "phantom order." In particular, McCullough's *pro hac vice* status was not revoked because he provided exhibits that he proposed to offer during the remainder of the trial. Rather, as shown by the material quoted above, the trial court, after a long series of interchanges with McCullough in which McCullough refused to accept the court's rulings, revoked McCullough's *pro hac vice* status because McCullough misrepresented to defendants on a Friday afternoon that he intended to offer on the following Monday exhibits that spanned 23 notebooks. ("On Monday, November 15, 2004, we will offer into evidence the attached exhibits.") Even more particularly, the trial court determined that McCullough not only did not intend to offer a great number of the purported exhibits on that Monday—but, even more, that he did not intend to *ever* offer a significant number of them at all.

Further, the "phantom" order was no "phantom"— and McCullough, by his own admission, understood as much. As evidenced by the colloquy quoted above, *see* 224 Or App at 105-07, the trial court, as a matter of efficient case management, directed that each party provide the other with notice of the exhibits that it intended to offer in the next court session, and to do so sufficiently in advance of that session as to

afford the opposing party a fair opportunity to identify potential objections, so that those matters could be resolved before testimony was elicited before the jury. That is, the trial court described a focused, *seriatim*, day-by-day approach to identification of potential exhibits and resolution of disputes pertaining to those exhibits. In responding to the trial court's questions regarding noncompliance with that process, McCullough admitted that he consciously deviated from the court's directive because he "thought instead of doing it every night, you know, handing them a list every night for the next day, if we handed them a list for the balance of the trial, we thought it would be helpful to them." As noted, the trial court ultimately deemed McCullough's benign "just trying to be helpful" rationalization to be patently disingenuous. *See* 224 Or App at 106-07.

■     In sum, the trial court revoked McCullough's *pro hac vice* status not because of some violation of a "phantom" order but, instead, because of his violation of an actual order, as exacerbated by his affirmatively misleading misrepresentations to opposing counsel regarding the exhibits to be offered and his lack of candor toward the trial court regarding his conduct and misrepresentations. With that understanding, our inquiry is straightforward: Given the totality of those circumstances, when viewed in the context of McCullough's prior conduct in the litigation, did the trial court err in revoking its allowance of *pro hac vice* status? Even more precisely, did the totality of the circumstances demonstrate "good cause" for revocation pursuant to Uniform Trial Court Rule (UTCR) 3.170?

    We begin by emphasizing that appearance in Oregon courts as *pro hac vice* counsel is a privilege, not a right. *See* ORS 9.241 (providing that the Supreme Court "may" adopt rules to govern *pro hac vice* appearances and that, "[s]ubject to those rules, an attorney who has not been admitted to practice law in this state *may* appear as counsel for a party in an action or proceeding before a court * * * if the attorney is associated with an active member of the Oregon State Bar" (emphasis added)); *see also Leis v. Flynt*, 439 US 438, 442-43, 99 S Ct 698, 58 L Ed 2d 717 (1979) (an attorney does not have a constitutional right to be admitted *pro hac vice*).

UTCR 3.170 prescribes the standards and procedures pertaining to the grant and revocation of that privilege. That rule was originally adopted by the Oregon Supreme Court in 1990 "to assure that out-of-state counsel are qualified to practice before Oregon courts." *See* Suggested 1990 UTCR Changes, Oregon Appellate Advance Sheets No. 4 (Mar 3, 1990) at 3-4; Order Adopting Amendments to the Uniform Trial Court Rules, Chief Justice Order No. 90-88 (May 17, 1990), Oregon Appellate Advance Sheets No. 11 (June 9, 1990) at A-2. The Supreme Court amended the rule in 1995 and 2001.[2] The 1995 revisions included the addition of subsection (3), which is the focus of our analysis.[3]

UTCR 3.170 states, in part, as follows:

"(1)   An attorney authorized to practice law before the highest court of record in any state or country ('out-of-state attorney') may appear on behalf of a party in any action, suit, or proceeding pending in this state before a court or administrative body even though that attorney is not licensed to practice law in this state, if the attorney satisfies all of the following requirements:

"* * * * *

"(c)   Associates with an active member in good standing of the Oregon State Bar ('local attorney') who must participate meaningfully in the matter.

"(d)   Certifies that the attorney will: comply with applicable statutes, law, and procedural rules of the state of Oregon; be familiar with and comply with the disciplinary rules of the Oregon State Bar; and submit to the jurisdiction of the Oregon courts and the Oregon State Bar with respect to acts and omissions occurring during the out-of-state attorney's admission under this rule.

"* * * * *

---

[2] *See* Order Amending Uniform Trial Court Rule 3.170, Pro Hac Vice, Chief Justice Order No. 95-040 (May 12, 1995), Oregon Appellate Advance Sheets No. 11 (June 5, 1995) (adding, among other changes, subsection (3) at issue in this case); Order Amending Procedures for Pro Hac Vice Practice in this State, Supreme Court Order No. 01-127 (Dec 5, 2001), Oregon Appellate Advance Sheets No. 1 (Jan 7, 2002) at A-3 (adding, among other substantial changes, the term "administrative body" to subsection (3)).

[3] *See* n 2.

"(3) The court or administrative body shall grant the application by order if the application satisfies the requirements of this rule, unless the court or administrative body determines for good cause shown that granting the application would not be in the best interest of the court or administrative body or the parties. *At any time and upon good cause shown, the court or administrative body may revoke the out-of-state attorney's permission to appear in the matter.*"[4]

(Emphasis added.)

■ Here, in revoking McCullough's *pro hac vice* status, the trial court acted pursuant to the final sentence of subsection (3). The plain language and structure of that sentence provide that, upon the prescribed condition, *viz.*, "good cause shown," the court "may"—not "shall"—revoke the attorney's *pro hac vice* status. Thus, although the court can never revoke *pro hac vice* status in the absence of "good cause shown," the court nevertheless retains some range of discretion not to revoke even upon such a showing. That construct, in turn, raises two questions. First, what is the meaning of "good cause shown"—and, collaterally, what is our standard of review as to whether that condition for revocation has been satisfied? Second, what is the range of a trial court's discretion with respect to revocation even when that prerequisite has been satisfied?

■■ We conclude, by reference to the Oregon Supreme Court's treatment of the term "good cause" in other contexts, that the content of that term is a matter of law. Further, to the extent that there are disputes as to the historical facts, or reasonably derived inferences, pertinent to the "good cause" determination, we will give considerable deference to the

---

[4] ORAP 8.10(4) permits attorneys to appear on appeal in the same manner as prescribed in UTCR 3.170. The Oregon Supreme Court promulgated UTCR 3.170 in accordance with ORS 9.241(1), which provides:

"Notwithstanding ORS 9.160 [requiring Oregon State Bar membership for practicing attorneys], the Supreme Court may adopt rules to govern the appearance in judicial and administrative proceedings by attorneys who have not been admitted to practice law in this state. Subject to those rules, an attorney who has not been admitted to practice law in this state may appear as counsel for a party in an action or proceeding before a court, or may appear as counsel for a party in an administrative proceeding, if the attorney is associated with an active member of the Oregon State Bar."

trial court's resolution of those factual matters. *State v. Johnson*, 339 Or 69, 116 P3d 879 (2005), is exemplary and especially instructive. There, the Supreme Court, in the context of determining whether "good cause" had been shown for failing to dismiss a prosecution notwithstanding violation of statutory speedy trial provisions, concluded:

> "We acknowledge the temptation to treat indefinite terms like 'good cause,' [or] 'sufficient reason,' * * * as calling for a subjective determination and, thus, as invoking personal judgment. However, it is clear that, when such terms appear in a statutory context, they are focused on real, albeit sometimes difficult to discern, legal standards: the *legislature's* view of what is 'good' [or] 'sufficient' * * *. As such, in the absence of a factual dispute, a determination that 'good cause' not to dismiss has been shown under * * * [the speedy trial statute] invokes an objective standard and must be reviewed for legal error.[10] In no case would judicial *discretion* play any role in the 'good cause' determination of *former* section 321 [of the speedy trial statute].

---

> "[10]    Of course, any trial court decision as to a disputed issue of *fact* will be reviewed under a far more *deferential standard*."

*Id.* at 86 (emphasis in original). *See also State v. Biscotti*, 219 Or App 296, 302, 182 P3d 269 (2008) (concluding that, as a matter of law, carelessness by a prosecutor could not constitute "good cause" for delay in entry of judgment for restitution).

Thus, the determination of whether the totality of the circumstances establishes "good cause shown" for revocation is a matter of law. But what *is* the meaning of "good cause shown" for purposes of UTCR 3.170(3)? In answering that question, we borrow from the methodology for construing statutes, *see PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), to discern and effectuate the Supreme Court's intent in adopting UTCR 3.170(3). *See, e.g.*, *State v. Zamora-Martinez*, 210 Or App 22, 25, 150 P3d 25 (2006) ("Our rules of appellate procedure are subject to the ordinary rules of construction concerning administrative rules and statutes, as set out in *PGE*[.]").

In pursuing that inquiry, the Supreme Court's own decisions construing the same term can be highly instructive—and, in fact, the Supreme Court has construed the phrase "good cause shown."[5] *See Lombardo v. Warner*, 340 Or 264, 270-72, 132 P3d 22 (2006). Although *Lombardo* arose in a very different context, the Supreme Court's construction of the same operative phrase as a general matter appears to be equally applicable here.

In *Lombardo*, the court considered a statutory "good cause shown" requirement concerning the Department of Transportation's ability to grant a variance from certain statutory restrictions to persons displaying a temporary sign. The Supreme Court stated that "[g]ood cause" is "a '[l]egally sufficient ground or reason' that 'depends upon [the] circumstances of [the] individual case.'" *Id.* at 272 (brackets in *Lombardo*) (quoting *Black's Law Dictionary* 692 (6th ed 1990)). The court then addressed the statute's requirement that good cause be "shown":

> "The word 'shown' indicates that the department must make its determination of good cause *on the basis of what the applicant demonstrates*. That requirement ensures that the applicant will be able to present information in support of its variance request and that the department will base its determination on that information."

*Id.* at 271 (emphasis added).

■       The term "good cause" for purposes of UTCR 3.170(3) embodies the same general meaning as that in *Lombardo*. The use of the term "shown" indicates, as it did in *Lombardo*, that the court must make its determination of good cause on the basis of what is demonstrated. In the context of an Oregon court's institutional authority and responsibility to regulate *pro hac vice* attorneys appearing before it, good cause can be "shown" by reference to the totality of the circumstances evinced in the record. That is, "good cause shown" in UTCR 3.170(3) does not require some sort of adversarial "showing" by a party proponent of revocation; rather—

---

[5] We have found no published discussion or historical materials illuminating the Supreme Court's intent in adopting the "good cause shown" formulation of UTCR 3.170(3).

or, at least, additionally—the court may, *sua sponte*, determine that revocation is warranted because the totality of the circumstances demonstrates the requisite "good cause."

Thus, *Lombardo* is instructive as to the generic meaning of "good cause shown." But it affords no guidance as to the particular content of that term with respect to revocation of *pro hac vice* status. For that guidance—specifically for enlightenment as to the factors material to the determination of "good cause" for revocation under UTCR 3.170(3)—we turn to the context of the revocation provision itself.

Primarily instructive in that regard are the proximate, immediately preceding provisions of UTCR 3.170(3) that govern the *granting* of *pro hac vice* status:

> "The court * * * shall grant the application by order if the application satisfies the requirements of this rule, *unless the court* or administrative body *determines for good cause shown that granting the application would not be in the best interest of the court * * * or the parties*. At any time and upon good cause shown, the court or administrative body may revoke the out-of-state attorney's permission to appear in the matter."

(Emphasis added.)

■ Thus, under the first sentence of UTCR 3.170(3), two considerations bear on the granting of an application to appear *pro hac vice*: (1) Does the application satisfy the requirements of UTCR 3.170(1)? (2) Would allowance of the application "not be in the best interest of the court * * * *or* the parties"? UTCR 3.170(3) (emphasis added). The use of the disjunctive "or" connotes that the application can be denied either if its allowance would not be in the court's "best interest" or if allowance would not be in the parties' "best interest."

To be sure, there are differences between the "allowance" formulation in the first sentence of UTCR 3.170(3) and the "revocation" provision of the second sentence. Most obviously, the second sentence refers only to "good cause shown" without the further, particularized reference to "would not be in the best interest of the court * * * or the parties." Nevertheless, as a matter of function and logic, it seems patent that

the Supreme Court intended that the same standards that pertained to the original allowance of *pro hac vice* status would apply to the continuation (or revocation) of that status. Thus, if an out-of-state attorney no longer satisfies the threshold requirements prescribed in UTCR 3.170(1)—*e.g.*, the attorney is no longer a member in good standing of the Bar of any other jurisdiction, or the attorney has discontinued his or her association with a member of the Oregon State Bar—that would constitute "good cause" to revoke the attorney's *pro hac vice* status. Similarly, if post-admission circumstances demonstrate that continuation of the attorney's *pro hac vice* status "would not be in the best interest of the court * * * or the parties," that, too, could establish the requisite "good cause shown" for revocation.

In this case, we do not understand the trial court to have based its determination of "good cause shown" on a finding that McCullough no longer met the threshold requirements prescribed in UTCR 3.170(1). Thus, the court's revocation order necessarily rested on a determination that McCullough's continued appearance in this matter was not "in the best interest of the court * * * or the parties." UTCR 3.170(3).

The parties point us to no Oregon authority further amplifying or refining those concepts. Nevertheless, in the context of the revocation of *pro hac vice* status, the "best interest of the court * * * or the parties" encompasses a variety of considerations. Those considerations reasonably include, at least, the following: (1) the severity of counsel's alleged misconduct; (2) the willfulness of counsel's alleged misconduct; (3) the extent to which the court had previously admonished counsel; (4) the frequency and seriality of counsel's alleged misconduct; (5) the context of counsel's alleged misconduct; and (6) the impact on the parties and the conduct of the litigation if counsel's permission to appear were revoked.[6]

---

[6] We acknowledge that jurisdictions differ on the requisite conduct sufficient to revoke *pro hac vice* status. *See Sheller v. Superior Court*, 158 Cal App 4th 1697, 1715, 71 Cal Rptr 3d 207, 219 (2008) (noting that the state of the law is "nonuniform" and providing a description of jurisdictions' differing standards for revocation of *pro hac vice* status).

Our understanding of "good cause shown" comports with the standards for revoking *pro hac vice* admission employed in several jurisdictions. *See, e.g., ACE*

Given the diversity of those considerations, the "good cause" inquiry will, almost inevitably, be case specific. Accordingly, we do not purport to define some universal or uniform standard of good cause here—and, indeed, we do not identify the precise limit of "good cause" in the circumstances of this case because, regardless of its exact location, McCullough clearly crossed that line.

McCullough's continued permissive appearance was "not in the best interest of the court." UTCR 3.170(3). In that regard, we observe that, contrary to plaintiffs' present insinuations, McCullough was not the innocent victim of some irrational and injudicious vendetta on the trial court's part.[7] There is no doubt, as shown by the quoted portions of the record above, that tension developed between the court and McCullough. The record reflects, however, that the reason for that tension was McCullough's persistent attempts to circumvent the court's rulings. McCullough incessantly attempted to revisit matters that the court had repeatedly and explicitly ruled on. Despite numerous reminders, rulings, and admonishments, McCullough continued to ignore

---

*American Ins. Co. v. Underwriters at Lloyds and Companies*, 939 A2d 935, 949 (Pa Super Ct 2007), *appeal granted*, 957 A2d 1179 (Pa 2008) ("The court may revoke an admission *pro hac vice sua sponte* or upon the motion of a party, if it determines * * * that continued admission *pro hac vice* is inappropriate or inadvisable."); *Williams & Connolly v. PETA*, 273 Va 498, 522, 643 SE 2d 136, 148 (2007) (court may revoke *pro hac vice* status at any stage of proceedings "when it appears that counsel's conduct adversely impacts the administration of justice"); *State v. Kavanaugh*, 52 NJ 7, 17, 243 A2d 225, 231 (1968) (interest of parties and interest of public in the integrity of the judicial process justifies revocation).

Some other jurisdictions require more specific findings, such as a violation of a rule of professional conduct. *See, e.g., Schlumberger Technologies, Inc. v. Wiley*, 113 F3d 1553, 1554 (11th Cir 1997) (requiring showing of unethical conduct "of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the district court"); *Filppula-McArthur v. Halloin*, 241 Wis 2d 110, 140-41, 622 NW 2d 436, 449 (2001) (revoking *pro hac vice* status is permissible on the grounds that the out-of-state attorney manifested an unwillingness to abide by the rules of professional conduct and an incompetency to represent client). We do not understand those considerations to be implicated here.

[7] Plaintiffs, for example, assert in their opening brief that the trial judge "made manifest his dislike of Tahvili, an Iranian immigrant (Tr. 360-61)." Pages 360 and 361 of the transcript, however, contain no statements made by the judge; rather, they contain statements made by McCullough to the jury, in which he described Tahvili's background and origins. We have found no basis in the record for the suggestion that the court was biased against Tahvili based on his country of origin, his immigration status, or for any other reason.

the orders of the trial court—and did so notwithstanding multiple warnings that his *pro hac vice* status was at risk of revocation.

Indeed—as the trial court observed, even before the dispute arose regarding McCullough's November 12 representations—it appears that McCullough, frustrated with the court's *in limine* rulings, may have been deliberately attempting to precipitate a mistrial. *See* 224 Or App at 102 (quoting trial court's observation, "not going to be a mistrial, because I really think that's what may be attempted to be gotten in light of dissatisfaction"). Given those circumstances, the trial court made it explicit, on repeated occasions, that Miller, as local counsel, needed to be actively participating in the case because of the very real possibility that McCullough would not be able to continue. The trial court further, expressly, found that McCullough had made an "intentional misrepresentation" to opposing counsel regarding the identification of the putative exhibits in the November 12 fax. We defer to that finding, *see, e.g.*, *Johnson*, 339 Or at 86 n 10, which, in all events, is well substantiated in this record. Implicit in that finding is a further determination that McCullough's benign and self-serving explanations of his conduct during his colloquies with the court constituted misrepresentations to the court.

In sum, the record discloses that, after his admission *pro hac vice*, McCullough, notwithstanding the trial court's admonitions, engaged in persistent conduct to subvert or circumvent the court's *in limine* rulings, willfully violated the court's case management directive regarding the identification of putative exhibits, made intentional misrepresentations to opposing counsel, and, in response to the trial court's inquiries regarding that conduct, offered responses that were, at least, less than candid. The totality of that conduct impaired the fair and efficient trial of this matter and, thus, was not "in the best interest of the court." UTCR 3.170(3). Those circumstances alone established "good cause shown" for revocation of McCullough's *pro hac vice* status.

We note further that McCullough's continued permission to appear in the matter was not in the "best interest

of * * * the parties."[8] UTCR 3.170(3). The rule's plural formulation—"the *parties*" (emphasis added)—contemplates a consideration of the interests of all parties (which, in some cases, may well be antithetical). Nevertheless, here, the totality of those interests militates in favor of revocation.

Defendants took no position as to whether McCullough should be permitted to proceed *pro hac vice.* However, defendants and their counsel were seriously inconvenienced after McCullough's misrepresentation about the contents of the 23 binders, because it resulted in several defense counsel putting in numerous unnecessary hours over the weekend needlessly reviewing materials that plaintiffs never intended to offer into evidence, much less to offer as exhibits during the next day of trial.

Conversely, with respect to plaintiffs' "best interest," we appreciate the potential hardship that clients in Oregon proceedings can incur when their out-of-state counsel's *pro hac vice* status is revoked. Nevertheless, the requirement of UTCR 3.170(1)(c) that out-of-state counsel associate with a member of the Oregon State Bar and that local counsel "must participate meaningfully in the matter" is designed, at least in part, to ameliorate precisely that potential hardship. Further, the trial court, after warning McCullough that his *pro hac vice* status was imperiled and that local counsel, Miller, would likely need to try the case, insisted on Miller's presence in the courtroom, ordering him to be present for the balance of the trial and to meaningfully participate. Ultimately, despite those efforts, it was McCullough (whom plaintiffs had retained) who placed plaintiffs at risk of injury, both by his conduct with respect to the court and opposing counsel and by failing to so substantially involve Miller that Miller was unable to continue when McCullough's *pro hac vice* status was revoked.

---

[8] As noted, *see* 224 Or App at 114, given the disjunctive phrasing of UTCR 3.170(3), it appears that a determination by the court that the out-of-state attorney's continued appearance in the matter was not in the best interest of *either* the court *or* the parties would be sufficient for revocation. That is, the court need not have determined that *both* the court's *and* the parties' interests were negatively affected. However, even if the rule could reasonably be construed as requiring both, based on the totality of the circumstances, revocation in this case was warranted.

In sum, the totality of the circumstances demonstrates that McCullough's continued appearance was not in "the best interest of the court * * * or the parties." UTCR 3.170(3). Accordingly, "good cause" was "shown" for revoking McCullough's permission to appear in this case pursuant to UTCR 3.170(3).

The question of the trial court's discretion under UTCR 3.170(3)—*viz.*, "the court * * * *may* revoke" (emphasis added)—remains. That language contemplates that a trial court may, in some circumstances, choose *not* to revoke *pro hac vice* status even after "good cause" for revocation has been established. However, we are hard pressed (although it may be abstractly possible) to identify a circumstance in which a trial court could be deemed to have abused its discretion when the court *revokes pro hac vice* status upon a showing of the requisite "good cause." In all events, the trial court did not abuse its discretion here. The court did not err in revoking McCullough's *pro hac vice* status.

■ We turn to the remaining and related assignments of error, which challenge (1) the trial court's denial of what plaintiffs style as a motion for a "continuance" and (2) the allowance of defendants' motion for a directed verdict when plaintiffs subsequently declined to proceed. The resolution of both matters turns on the answer to a common question: Does a trial court abuse its discretion in denying a party's motion to "reset" or "reschedule" a trial after the trial has commenced and the party's lead attorney has been disqualified from trying the case due to his behavior, and the party's remaining attorney, who was subject to a requirement of "meaningful participation," declines to proceed? The answer is no.

We emphasize, at the outset, that plaintiffs' local counsel, Miller, never requested a brief continuance, of only a few days, in order to proceed with the trial. Rather, in total context, plaintiffs asked the trial court to "*reset* the trial and ask for a continuance and *reschedule the trial* to allow [plaintiffs] to obtain counsel." (Emphasis added.) They did so because Miller was "not prepared to try the case" and plaintiffs were entitled to representation by counsel "that is prepared to present the case." Plaintiffs, in effect, sought a midtrial mistrial, after a jury had been impaneled and had heard

evidence, with trial to be completely rescheduled—presumably, months later, after new counsel had an opportunity to be fully prepared to try a complex commercial case. The sole basis for that motion was that, notwithstanding the requirements of UTCR 3.170(1)(c), plaintiffs' local counsel was not prepared to proceed. After the trial court denied plaintiffs' motion, plaintiffs did not move, alternatively, for a short, mid-trial continuance, which might have enabled local counsel to proceed.

Even with respect to rulings on motions for "true" continuances—as opposed to the circumstances presented here—we review for abuse of discretion. *See State v. Hug*, 186 Or App 569, 572, 64 P3d 1173, *rev den*, 335 Or 510 (2003). We have reversed a trial court's denial of a motion for continuance in the midst of a trial only in the most extraordinary circumstances. *See, e.g., State v. J. C.*, 215 Or App 496, 497, 170 P3d 1083 (2007) (court abused its discretion in denying continuance during a mental commitment hearing in a hospital where "appellant was naked in a hospital room, in the midst of a medical crisis, and unable to hear or participate meaningfully in the entire proceeding"). In contrast, we note that we have consistently held that, in situations in which a party puts *itself* in a position of needing to seek the services of a different attorney before or during trial, a court does not abuse its discretion in denying a motion for a continuance. *See, e.g., Wells v. Santos*, 211 Or App 413, 155 P3d 887, *rev den*, 343 Or 160 (2007); *Hug*, 186 Or App at 572; *State v. Makinson*, 174 Or App 544, 27 P3d 1046, *rev den*, 332 Or 559 (2001); *State v. Spry*, 166 Or App 26, 999 P2d 485, *rev den*, 331 Or 244 (2000); *State v. Brenner*, 151 Or App 159, 947 P2d 1139 (1997); *State v. Keerins*, 145 Or App 491, 932 P2d 65 (1996).

There was no abuse of discretion here. As noted, the trial was in progress; the jury had been impaneled and had heard evidence. Plaintiffs did not seek a mere continuance—but, instead, a complete trial reset, potentially requiring months of delay, with concomitant expenditure of judicial resources and substantial expense to defendants. Indeed, the practical effect of that motion would be tantamount to that of the mistrial that the trial court had earlier suggested that McCullough was attempting to provoke. Finally, plaintiffs' request was not the product of some unavoidable cause (*e.g.,*

counsel suffering some disabling condition). Rather, it was precipitated by circumstances of their own counsels' making—the combination of McCullough's conduct and the failure to sufficiently involve Miller so that he could proceed after, perhaps, a short continuance, if necessary.

The trial court did not err in denying plaintiffs' request for a trial reset. *Cf. Keerins*, 145 Or App at 495 ("It is not an abuse of discretion to deny a continuance that is requested on the day of trial, when a [party] had a reasonable opportunity to obtain counsel but had failed to do so because of his own lack of effort and his own choice."). Further, given plaintiffs' subsequent refusal to proceed and consequent failure of proof, the trial court correctly granted defendants' directed verdict motions against the remaining claims.

Affirmed.